**ÆTNA CASUALTY & SURETY CO. v. COMMERCIAL STATE BANK OF RANTOUL et al.**

Circuit Court of Appeals, Seventh Circuit.
June 8, 1927.

Rehearing Denied July 22, 1927.

No. 3836.

1. **Insurance** ☞646(6)—**In suit respecting bank cashier's bond, bank must show cashier's misappropriations within effective dates of surety's obligation.**

In suit respecting bond of cashier of incorporated "new bank," which continued business of "old bank," which was partnership conducted by such cashier and father, burden of proving that accommodation notes were worked into assets by cashier within effective dates of surety's obligation was on defendants, since fraud relied on cannot be presumed, but must be proved.

2. **Insurance** ☞665(4)—**Evidence held to show that any taking of assets of bank by cashier was before effective date of cashier's bond.**

In suit respecting bond of cashier of incorporated "new bank," which contined business of "old bank," which was partnership conducted by such cashier and father, evidence *held* to show that any taking of assets by cashier was before effective date of surety's obligation.

3. **Insurance** ☞665(4)—**Evidence held insufficient to establish liability under bond of bank cashier for sum paid by bank after closing to settle note given by cashier.**

Evidence *held* insufficient to establish liability under cashier's bond for item paid by bank after it closed to settle note given by cashier to third person, on which it was thought bank might be liable.

Appeal from the District Court of the United States for the Eastern District of Illinois.

Suit by the Ætna Casualty & Surety Company against the Commercial State Bank of Rantoul and others, in which the defendants filed a counterclaim. Decree for defendants, and complainant appeals. Reversed, with direction.

William M. Acton, of Danville, Ill., and Louis L. Dent, of Chicago, Ill., for appellant.

Walter T. Gunn, of Danville, Ill., and O. B. Dobbins, of Champaign, Ill., for appellees.

Before ALSCHULER, PAGE, and ANDERSON, Circuit Judges.

PAGE, Circuit Judge. Appellant sued appellees for an accounting and to enjoin appellee, Commercial State Bank of Rantoul, called New Bank, from prosecuting its suit at law against appellant on the bond set out in the margin.[1]

———

[1] The Ætna Casualty & Surety Company, Hartford, Connecticut.

Morgan G. Bulkeley, President.

Bond No. F. 507806.     Amount, $10,000.00.

Know all men by these presents, that we, Glenn Robinson (hereinafter called the employee), as principal, and the Ætna Casualty & Surety Company, as surety, are held and firmly bound unto Commercial State Bank of Rantoul (hereinafter called the employer) in the penal sum of ten thousand and no/100 ($10,000.00) dollars, in good and lawful money of the United States, for the payment of which amount we do bind ourselves, our heirs, executors, administrators, successors, and assigns, jointly and severally, firmly by these presents.

Dated this 23d day of December, 1920.

Whereas, the employee has been appointed to the position of cashier in the service of the employer, and has applied to the Ætna Casualty & Surety Company for this bond.

It is hereby covenanted and agreed that the surety, for and in consideration of a premium based upon an annual rate of twenty-five cents per one hundred dollars of suretyship, paid or to be paid to it by the employer, hereby binds itself to pay to Commercial State Bank of Rantoul (as employer) such pecuniary loss as the employer shall sustain of money or other personal property (including that for which the employer is legally responsible) through the fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction, misapplication or misappropriation or any other dishonest or criminal act or omission directly or in connivance with others while such employee holds any position at any location in the service of the employer, during the period commencing with the 1st day of January, one thousand nine hundred and twenty-one, at twelve o'clock noon, standard time.

First. In case of recovery of any loss, or portion thereof, from other than reinsurance or coinsurance, whether by employer or surety, the employer shall be entitled thereto until fully reimbursed, the excess, if any, to be paid to the surety, except that the surety shall be reimbursed from such recovery for actual expenses incurred in obtaining such recovery.

Second. Upon the discovery by the employer of any loss, the employer shall promptly deliver notice thereof to the surety at its home office in Hartford, Conn., and within three months after such discovery the employer shall file with the surety at its home office a written statement of claim giving particulars of such loss. The surety shall have two months

The New Bank abandoned its suit at law, filed answer, and set up counterclaims on the original bond and on what it claims are renewals, constituting two additional obligations of $10,000 each. The alleged renewals are based on the following letters and statement, and payment of the premiums there demanded.

"Chicago, Ill., Feb. 14, 1922.

"Mr. Glenn Robinson, Rantoul, Illinois. Dear Sir:

"Re F–17264–1–1–22.    Glenn Robinson— $25.00.

"F–17283  Do    G. L. Campbell— 12.50.

"With reference to your notation on the bottom of our letter of Feb. 11, 1922, we wish to advise that the original bonds suffice in the above cases. We might mention there are no renewal certificates issued under this particular form of insurance, inasmuch as these bonds are continuous by their own terms until such time as the party concerned leaves the employ of the company. At the expiration of each year, a renewal charge is set up and a bill sent the agent. This being the only record he receives on renewals of this kind. Very truly yours, [Signed] Geo. Tramel, Manager."

---

after claim has been presented in which to verify and pay same, during which time no legal proceeding shall be brought against the surety as to that claim, nor at all as to that claim after the expiration of fifteen months from time of its presentation.

Third. This suretyship shall only terminate by: (a) The employer giving written notice to the surety, specifying the date of termination or the surety giving thirty days' written notice of termination to the employer. In either case the surety shall refund the unearned premium to the employer.

(b) The retirement of the employee from the employ of the employer or upon discovery of loss through the employee.

Fourth. The surety shall be liable for those losses only which shall be discovered during the term the bond is in force, or within two years after the termination thereof. No preliminary application by the employer for this bond is necessary. This bond incorporates the entire agreement between the surety and the employer.

In witness whereof, the employee has hereunto set his hand and seal, and the surety has caused this bond to be signed by its resident vice president, attested by its resident assistant secretary, and its corporate seal to be hereunto affixed the 23d day of December, A. D. 1920. The Ætna Casualty & Surety Company, by Richard E. Cline, Resident Vice President.

Signed, sealed and delivered by the employee in the presence of ——.

Attest: Maurice J. Schumaecker, Resident Assistant Secretary.

"Apr. 1, 1923.

"Mr. Glenn Robinson, Rantoul, Ills.— Policy Number F–17264.    Date 1–1–23. Glenn Robinson.    Premium $30.00."

Upon which said statement was stamped by the said complainant the following: "Chicago Branch Office.    Paid April 20, 1924.    Geo. Tramel, Manager, per M. V."

The claim is made that the original bond protected the bank to the extent of $10,000 for the year 1921, and when the premium was again paid it was the making of a new bond for $10,000 for the year 1922, and when the premium was again paid in 1923 there was made for that year a new bond for an additional sum of $10,000.

The counterclaim averred and set out various losses during each of those years, and the District Court found, in accordance with appellees' contention, that there were three bonds and losses for each of the years. Damages of $24,340 and interest from January 15, 1924, were awarded.

For many years prior to 1921, Parrish Robinson and Glenn Robinson, his son (who was the person bonded), conducted, as a partnership, the Commercial Bank of Rantoul, called the Old Bank. Charter for the New Bank was applied for on March 1, 1920. December 10, 1920, appellee McCabe was elected president and Glenn Robinson cashier. The Old Bank closed its business on Friday, December 31, 1920. Because of New Year's Day and Sunday, the New Bank opened January 3, 1921. The individual defendants were officers, directors, and stockholders of the New Bank. August 27, 1923, the New Bank was closed by the state auditor and Glenn Robinson disappeared. There was an alleged shortage of nearly $40,000.

The theory of liability is (a) that the books show that Robinson appropriated items amounting to $2,240; (b) that various of the officers and stockholders, on request of Robinson, gave the New Bank their notes, aggregating $35,000, without any consideration, but solely for the accommodation of the New Bank, to be used as collateral security for money to be borrowed from other banks at 5 per cent. and reloaned by the New Bank to its customers at 7 per cent.; but, as alleged, instead of so using the accommodation notes, Glenn Robinson put them among and as a part of the assets of the New Bank, and, whenever a note was so made a part of the assets, he appropriated to his own use an equal amount of the real assets, and thereby caused a loss in the amount of the notes. Other facts will sufficiently appear in the consideration following.

The president and other makers of the accommodation notes established two things by their testimony: (a) That they made the notes as accommodation notes for the purpose stated; (b) that the president and other officers and directors left the management of the New Bank wholly to Robinson, and themselves did nothing and knew nothing about its affairs. The latter is well established, if we are to believe their testimony that they knew nothing of the alleged wrongful use of the notes or of the alleged appropriation of assets, because the first report of the New Bank to the state auditor showed bills payable of $39,000. The auditor's report of March 1, 1921, showed six excessive loans. That of January 3, 1922, showed nine excessive loans, one of which was to the president, and they equaled nearly 60 per cent. of all bills receivable. The same report criticized failure of directors to realize their responsibilities and to attend meetings. In that report and in one following on March 9, 1922, the notes of many of the directors and stockholders were criticized as past due. There are many other matters in the record, some of which it would seem should have challenged the attention of the officers.

It is most unfortunate that men seek and take positions of responsibility, where not only their own money is risked, but also that of others, who have a right to rely upon their doing their duty, and then seek to excuse themselves for failure to do their duty because they relied on some one else believed by them to be honest. Such failure in duty will not excuse appellant, if the facts show liability. The evidence is to be found in the testimony of Heiser, an auditor for appellees, and in his audit and supplemental audit, and in the testimony of Kesler and Maxwell, auditors for appellant, and in their audit.

Heiser says he started his audit as of January 1, 1921, and gave no attention to the Old Bank; but in his supplemental audit he presented a schedule "Bills Receivable Account Commercial Bank Dec. 1, 1920, to Dec. 31, 1920," which he starts with the item, "Nov. 30, 1920, $86,645.75." That item he testified he could not analyze. Following, he gave an itemized list of notes taken and of those paid during December. Numbers and amounts are stated, but not names. He finds the bills receivable, December 31st, $80,082.95. With that item he starts another schedule, headed: "Commercial Bank Balance Sheet Dec. 31, 1920. Adjusting Entries to Conform with Ledger Ac-

counts. Commercial State Bank Balance Sheet Beginning of Business Jan. 3, 1921." This appears to be, in the first column, a balance sheet of the Old Bank, and the same for the New Bank in the third column. Between, in the second column, are the "adjusting entries," showing the difference between the two.

This schedule shows several matters which do not aid the contention of appellees. They contend (a) that the accommodation notes were no part of the assets of the Old Bank or of the New until April 20, 1923, and after, yet this schedule leaves unitemized the bills receivable of the Old Bank, and unexplained and unitemized $13,334.28 of the New Bank that were possibly a part of the difference between the bills receivable of the Old Bank, when it was closed, and those of the New Bank, at its opening. While there may be some evidence and some guesses that that item was in the Old Bank as a part of the cash and cash items, yet there is also evidence that bills receivable were frequently so carried, and we are brought no nearer to an understanding of what that item was. Despite anything that appears, it might have represented a part of the accommodation notes. The schedule shows bills payable at the close of the Old Bank and at the opening of the New of $29,000. We find nowhere any analysis or explanation of what those bills payable were.

Appellees contend (b) that there were sufficient assets received from the Old Bank into the New Bank, so that when Robinson worked the accommodation notes into the assets of the New Bank on April 20, 1921, and at various dates thereafter, he took out each time, and converted to his own use, an amount of assets equal to the note so worked in. While there is no record of the fact, it is admitted that the New Bank took over the assets of the Old; but of what the assets of the Old Bank consisted, or what was actually turned over, is not shown. The showing of so many dollars in bills receivable, or of any other item of assets on the books of the Old Bank, falls far short of showing of what they consisted, or that the bank actually had such assets on hand. We find nothing in the record from which it can be presumed. Heiser was asked:

"Q. Do you know any way to determine what the assets of the bank were, except by the actual assets on hand? A. That is the only way."

[1] In default of a showing of what the assets represented by the bills receivable item of the Old Bank consisted, we find nothing

from which it can be presumed, either that the accommodation notes were not a part of those bills receivable, or that there were actual assets to the amount shown by books of the Old Bank turned over by it to the New Bank. The burden of making such proof was upon the appellees, and such fraud as is relied upon cannot be presumed but must be proved. Further, in this connection, it appears from the testimony of Heiser that all of the accommodation notes, with one possible exception, originated in December, 1920, and the record evidence, furnished by him, shows that all so originated, and that all of them appeared upon the Old Bank's note register, a copy of which was put in evidence by appellees.

Although Heiser said he could say positively that none of the accommodation notes entered into the bills receivable account of either bank prior to January 1, 1921, yet his whole testimony shows that that statement needed explanation. He did not mean that they did not appear upon any of the Old Bank's books, because, as shown above, his copy of the Old Bank's note register, put in evidence, shows every one of them in 1920. He did not mean that they were not among either the $80,082.95 bills receivable or the cash items of $22,202.16, shown by him to be in the Old Bank at its close, because he says he did not know, except as to $12,000, of the $22,202.16 item what did make up either of those items. Neither did he know what bills receivable the New Bank opened with, other than the $12,000 above referred to. Concerning the bills receivable of the Old Bank, Heiser was asked:

"Q. All you did, you started with the assumption that there were bills receivable in that amount at that time as per the old records? A. Yes."

That there were several ways in which the accommodation notes might have been used as assets of the Old Bank, and that Heiser did not pretend to know whether they had been so used or not in 1920, are clearly shown by the following from his testimony:

"Q. If Glenn Robinson had had notes, notes that were worthless, for $13,000, there was nothing to prevent him from taking these out of the assets of the bank and putting in $13,000 of these accommodation notes, and carrying them during the balance of December, 1920? A. There was nothing to hinder that.

"Q. You don't know whether he did that or not? A. No. sir.

"Q. In the method of bookkeeping you found carried on by this bank, when a note passed out of the assets of the bank either by payment or renewal, there would be a credit ticket put in the business there, and a record was made on bills receivable crediting that particular note by number? A. Yes.

"Q. Would that indicate to you as a bookkeeper that it had been an asset before, or they would not have credited that note? A. It would indicate that, but it would not necessarily apply.

"Q. But, if you followed out their system of bookkeeping, that is exactly what it would indicate to you? A. Yes, sir.

"Q. What basis have you for making that statement that it was not a part of the assets before? A. Because it had never been debited to the bills receivable.

"Q. Was it necessary that it be debited to bills receivable in order to make it a part of the assets of the bank? A. Not exactly.

"Q. Then answer this question: If Glenn Robinson, when he came to organize a new bank, on January 1, 1921, didn't have assets as indicated by the books of the old bank, and it took all these accommodation notes and these two missing notes to make the balance in the new bank, then wouldn't you say they were assets of the new bank, if that was actually done? A. That could have been done.

"Q. And you don't know that it wasn't done? A. No.

"Q. There is nothing on these books from which any bookkeeper could say that wasn't done? A. No, sir. I do not know that when the bank examiner first audited this bank that he found these so-called accommodation notes in there as a part of the assets of the bank; if I had known that he found that, it would not change my opinion.

"Q. Even if they were there, and a part of the assets by the Bank Examiner found and counted, that would not cause you to think they were really assets at that time? A. Depending on when the examination was made.

"Q. I say at the first examination—do you know any way to determine what the assets of the bank were, except by the actual assets on hand? A. That is the only way. If the bank examination was made later than the opening date of business, the accommodation notes could supplant other assets. On page 4 of my supplemental report I made the conclusion that $24,960 of these accommodation notes did not become assets of this bank until after the first year's existence of the new bank. I made that assumption solely from the fact that I found no debit to bills receivable with the entries or with the

numbers of these notes on them. The items I have given for the year 1921 is the date I found the credit of the original numbers when they were first renewed.

"Q. Now, if, after three examinations in the year 1921 by the state auditor's office, he found each of these eight notes you have listed there as a part of the assets of the bank, and counted them, and they were turned over to him as part of the assets of the bank, if you had known that, your opinion would be different as to these eight notes, wouldn't it? A. Not so far as the records.

"Q. Well, you have no basis in fact, in bookkeeping or otherwise, upon which to base your conclusion that these notes were not assets of the bank on January 1, 1921, except the mere fact that there had been no debit entry by any numbers up to that time; isn't that true? A. I will answer that by saying, except by the fact that they were not entered."

Heiser reached the point in his testimony where he admitted that his assertion that the accommodation notes were not in the assets of the Old Bank was a mere assumption, based solely upon the fact that he found no debit to bills receivable with the entries or the numbers of those accommodation notes on them. It seems unnecessary to consider the basis of, and the method by which Heiser reached the conclusion that, technically speaking, the Old Bank's records did not show correct debits to bills receivable of the notes before January 1, 1921, because the record does show that they were, in fact, used as assets of the Old Bank in 1920.

The audit and testimony of Kesler and Maxwell establish the fact, and the note register shows, that the accommodation notes were a part of the assets of the New Bank at its opening, and that they were there as shown by the state auditor's report of March 2, 1921.

Counsel for appellees urge that the note register was not a record of the Old Bank, but "a mere memorandum." It seems strange that "a mere memorandum" should be so carefully kept by the Old Bank, and just as carefully continued and kept through all the days of the New Bank, and is the only book or "memorandum" brought here in full. The bookkeeper called the note register one of the books of the bank. She said: "The bills receivable register is in court now. I took that from this book marked 'Note Register,' from the duplicate ticket."

Probably she is not wholly responsible for it, but her testimony, as abstracted, is very much mixed and extremely confusing.

After testifying at great length about the use of pink tickets or slips, much relied on by both Heiser and counsel for appellees in argument, she said she was mistaken, and that the pink slip was used for a wholly different purpose—a fact seemingly overlooked by counsel in their brief. It is unimportant, except as illustrating some of the uncertainties in appellees' evidence.

[2] We find that the evidence shows that, if assets were really taken out by Robinson, it was done before the effective date of appellant's obligation, and there is no basis for indulging a presumption that anything was taken out by Robinson at the various times when on Heiser's theory the accommodation notes were worked into the assets. Heiser's supplemental audit shows, as misappropriations by Robinson:

| | |
|---|---|
| Three interest items paid from bank funds on Robinson's note to Mrs. Ekblow | $ 90 |
| Charles Blood note | 1,700 |
| Draft on First National Bank Chicago, Cr. to Robinson | 450 |

The Blood note was the subject of many pages of testimony, and it all seems to rest on nothing more substantial than the conclusion of Heiser that, after the note was paid by Blood, it was left standing on the bank's books as unpaid. The note register shows it paid January 20, 1922, and Heiser testified that at the closing of the New Bank he did not find it necessary to deduct $1,700 to make the bills receivable balance. The other auditors found bills receivable in balance. There are other transactions used by Heiser in reaching his conclusions, but, on the whole, we deem the evidence far too unsubstantial to sustain a recovery. As to the $450 item, it is quite impossible to arrive at the conclusion that the bank lost anything, either by fraud or otherwise. Heiser was twice asked where the items about which he was testifying, and out of which it is claimed that the $450 loss grew, were debited, but there is no answer in the record. Those were material questions and should have been answered.

[3] As to the interest item of $90, Heiser said that Robinson left a large credit balance in the New Bank when it closed, against which all items owed by him to the New Bank or to others which the New Bank might have to pay were charged. One of those items was $750, paid by the bank after it closed to settle a note given by Robinson to Mrs. Ekblow, and on which it was thought the New Bank might be liable. Ninety dollars interest had been paid to Mrs. Ekblow.

What Heiser said is that the state bank examiner charged the $750 to Robinson and the $90 to the New Bank. It would require more evidence to establish a liability on that item recoverable under the bond.

We deem it unnecessary to pass on the question as to whether there was a single or a triple liability under appellant's obligation, or whether the evidence concerning the use of the books of the Old Bank was erroneously admitted.

The decree is reversed, with direction to find against the appellees on their counterclaim and in favor of appellant, directing a permanent injunction against the prosecution of suits upon the bond.