COUNTY OF PINE *vs.* DON L. WILLARD and others.

August 17, 1888.

**County Treasurer — Liability of Sureties — Defalcation in Preceding Term — Burden of Proof.**—A county treasurer who had filled the office during two successive terms, upon surrendering his office during the second term, failed to account for or pay over all of the funds then properly chargeable to him. *Held*, that the sureties for the second term were *prima facie* responsible for the deficiency, and that, if they would exonerate themselves upon the ground that this deficiency had occurred during the prior term, the burden was upon them to show that fact.

**Same — Effect of Proof of Defalcation in Former Term.**—The fact that the officer had converted funds during the first term considered as not conclusively showing that such conversion was identical with the deficiency in question; there being evidence of continued conversion during the second term.

**Same — Moneys used to Cover Previous Delinquency.** — The sureties for the second term would be responsible for money coming into the treasury during that term, although it was placed there merely to cover a previous defalcation. So they would be responsible if public money received during the second term were misapplied to cover a previous delinquency.

Same—Commissioners' Knowledge of Previous Defalcation.—The fact
that the board of county commissioners knew, when they accepted the
defendant's bond, that the officer had been chargeable with conversion of
funds during the prior term, does not avoid the bond.

Appeal by defendants from a judgment of the district court for Pine
county, where the action was tried by *Crosby*, J., a jury being waived.

*Fayette Marsh*, for appellants.

*L. H. McCusick*, for respondent.

DICKINSON, J. The defendant Willard was treasurer of Pine county
from the 1st of March, 1877, until about the 1st of December, in that
year, when he resigned. He had also been the treasurer for the im-
mediately preceding term. The other defendants were sureties upon
Willard's official bond for the term commencing in March, 1877.
This action was brought to recover for an alleged defalcation during
the second term. Upon a trial of the cause, the court found a de-
ficiency of $875.15, for which, with interest from December 1, 1877,
the defendants were held to be liable. It is contended that the evi-
dence did not justify the finding that this defalcation occurred during
the second term of the officer, for which alone these sureties are re-
sponsible; but that it, or at least the greater part of it, occurred dur-
ing the previous term. In December, 1877, Willard ceased to hold
the office, and it was then transferred to a successor. The evidence
abundantly justified the conclusion that he did not then account for
or turn over to his successor the funds chargeable to him, and that
there was then a deficit in the funds belonging in the treasury, to an
amount at least equal to that found by the court. This made a case
for a recovery against these defendants, unless at least it affirma-
tively appeared that the funds thus deficient had not been received
during this second term, and had not been in the treasury during
that period; the burden being thus cast upon the defendants to over-
come the *prima facie* case which was made out by proof of the de-
fault to account for the funds belonging in the treasury, and properly
chargeable against him at that time. *Kelly* v. *State*, 25 Ohio St.
567; *Bruce* v. *U. S.*, 17 How. 437; *Hetten* v. *Lane*, 43 Tex. 279.
It is not supposed, however, that these sureties would be chargeable
if all of the funds received during the second term, or which at any

time during that term had been in the treasury, had been properly disbursed or accounted for.

There is evidence going to show that Willard, during his former term, as well as during the second term, misappropriated the public funds, and that never after June, 1876, did he have in the treasury the funds belonging there. It appears that no bank or other depository was ever designated by the proper officers of this county for the deposit of public funds, as prescribed by chapter 38, Laws 1873. It also appears that Willard was accustomed to deposit such funds in certain banks in the city of St. Paul, to the credit of "Don L. Willard, treasurer of Pine county;" and, as appears by his own testimony, that he used such funds the same as he did his own. Considering such testimony, in connection with what is shown as to the amounts of money received by Willard as treasurer during his second term, we think that the court was justified in its conclusion that Willard had misappropriated and failed to account for funds received during this second term to the extent of at least $875.15. That Willard misappropriated funds during that term to a far larger amount seems, from his own testimony, to be most probable; for it was a conversion and embezzlement of the trust funds to deposit them to his own credit, so as to be undistinguishable from his private funds, and to use and treat such deposits as though it had been private property. The proofs were not such as to require the court to adopt the conclusion that the deficit found to exist in December, 1877, was referable to a period prior to the then current term, and that the funds coming into the treasurer's hands during the latter term had been faithfully kept and disbursed. The evidence tended to establish a contrary conclusion. There is some evidence tending to show that Willard made good the deficit with respect to his former term; and if in fact the money was in any way brought into the treasury, even though it was intended to be, and was afterwards, again abstracted, these defendants would be responsible therefor. *Parker* v. *Medsker,* 80 Ind. 155; *Goodwine* v. *State,* 81 Ind. 109; *Ingraham* v. *Maine Bank,* 13 Mass. 208. And even if the prior defalcation were not made good by repayment of money into the treasury for that purpose, it would not necessarily follow that this deficit, found to exist

at the close of Willard's incumbency, is referable to the preceding term, so that these sureties would not be responsible. If the funds received during the second term were misapplied to make up for a prior delinquency, these sureties would be liable for that misapplication. *Gwynne* v. *Burnell*, 7 Clark & F. 572; *Inhabitants of Colerain* v. *Bell*, 9 Met. 499. To illustrate, by an hypothesis suggested by Willard's conduct during his second term, we will suppose that during the former term Willard, being out of public funds by reason of his embezzlement, gave post-dated checks upon his banker in payment of official warrants presented for payment, and which he thus took up and held as vouchers, as though they had been paid out of public funds. Suppose, then, that to meet such outstanding checks he afterwards deposited to his account public moneys received during his second term. This would be in effect a use of such funds to pay his own personal obligation, and for that these sureties would be answerable. From the evidence, and in view of the fact that Willard's course of embezzlement and conversion appears to have continued without change, it seems quite as probable that whatever deficit there may have been during the first term was covered by some such or like means, as that it had remained and been carried over as a deficit into and through the second term. Our conclusion is that while it is not entirely certain from the evidence whether the whole of this deficit was of funds received during the second term, yet the finding of the court was justified by the evidence.

The appellants admit and claim that the deposit of the funds, as above indicated, in itself constituted an embezzlement; and they contend that, inasmuch as the county commissioners knew that Willard had so kept the public money during the prior term, it was a fraud upon these sureties to accept their bond, and that this avoided the bond. This position cannot be sustained. If the board did know that Willard had embezzled money during the former term, they were under no obligation to voluntarily warn these defendants, nor to protect them from Willard's possible dishonesty in the future, by declining to accept their tendered suretyship. If the bond was sufficient, it was their duty to accept it.

Judgment affirmed.