ROYAL INDEMNITY CO. et al. v. NORTH TEXAS NAT. BANK et al.

No. 1323—5426.

Commission of Appeals of Texas, Section A.
March 26, 1930.

Turner, Rodgers & Winn, and Saner, Saner & Jack, all of Dallas, Charles L. Black, and Black & Graves, all of Austin, for plaintiff in error Royal Indemnity Company.

R. L. Stennis, of Dallas, for plaintiff in error American Surety Co., of New York.

Thomas, Storey & Grady, Touchstone, Wight, Gormley & Price, and Wallace, Taylor & Vickery, all of Dallas, for defendants in error.

CRITZ, J.

This suit was instituted in the district court of Dallas county, Tex., by North Texas National Bank against W. C. Spangler, Royal Indemnity Company of New York, American Surety Company of New York, and the Southwest National Bank, to recover an alleged shortage of W. C. Spangler in the sum of $38,571.28, and interest. The defendant Spangler made no defense. The other defendants all answered. The pleadings are very voluminous, and we content ourselves with saying that they are sufficient to present the issues here involved.

Trial was had in the district court before the court without the intervention of a jury, and judgment rendered as follows:

"(1) That North Texas National Bank recover $38,571.28 principal and $9,605.54 interest at 6% from May 16th, 1925, totalling $48,176.82, with interest at 6% and costs of suit against W. C. Spangler, Royal Indemnity Company and American Surety Company;

"(2) That each of said companies should have judgment over against W. C. Spangler;

"(3) That Southwest National Bank should recover from American Surety Company $3,672.36 as interest accumulated on various defalcations to May 16th, 1925;

"(4) That Royal Indemnity Company should recover over against American Surety Company for $48,176.82;

"(5) That American Surety Company take nothing on its cross action; and

"(6) That North Texas National Bank take nothing on its action against the Southwest National Bank."

The Royal Indemnity Company, and the American Surety Company both appealed from the above judgment to the Court of Civil Appeals for the Fifth district at Dallas, which court reformed the judgment of the North Texas National Bank against the Royal Indemnity Company by reducing the interest allowance to $5,249.88, which added to the principal judgment of $38,571.28, totals $43,821.16, and, as reformed, this part of the judgment of the trial court was affirmed. The judgment of the trial court for the North Texas National Bank against the American Surety Company, and for the Royal Indemnity Company against American Surety Company were also reversed and judgment rendered for the American Surety Company. The judgment for the Southwest National Bank against the American Surety Company for interest was reformed by reducing the recovery to the sum of $3,341.64, and, as reformed, affirmed. In all other respects the judgment of the district court was affirmed. The Royal Indemnity Company and the American Surety Company have both prosecuted writs of error to the Supreme Court, and both applications have been granted.

It seems from the findings of the trial court, which are supported by the record before us, that the North Texas National Bank began business at Dallas, Tex., on May 16, 1925; that the Southwest National Bank began business at Dallas, Tex., on June 19, 1921; and that the Security National Bank was doing business at Dallas, Tex., on and after January 10, 1917. After the incorporation of the Southwest National Bank, it acquired from the Security National Bank its business, and certain of its assets, on or about June 19, 1921, and the Security National Bank thereafter ceased to do business as a bank, and the business originally conducted by it was succeeded to and continued by the Southwest National Bank under a contract between the two banks. The Southwest National Bank continued to do business until the close of business on May 14, 1925. On or about said date, by agreement between them, the North Texas National Bank took over the banking business of the Southwest

National Bank, together with certain assets, and assumed certain liabilities. The Southwest National Bank closed its doors and ceased doing a banking business on Saturday night, May 14, 1925, and the North Texas National Bank opened its doors for business on the following Monday morning, May 16, 1925.

While Security National Bank was in operation, Spangler was an employee of such bank as a "teller." When the Southwest National Bank succeeded to the business and assets of the Security National Bank, Spangler immediately became an employee of the Southwest National Bank in the same capacity and continued in such capacity with the Southwest National Bank until it closed its business on May 14, 1925. When the North Texas National Bank opened its doors for business on May 16, 1925, Spangler immediately became an employee of the last-named bank in the same capacity, and continued in such capacity until September 2, 1925. Spangler's duties with the three banks, during all the times referred to, were to receive deposits for such banks from the customers of the banks, and the public generally, and to place and leave the money so received in the proper places in the bank, and to make proper entries so that the customers of the bank would receive credit for their deposits; and generally such duties as a bank receiving teller is called on to perform. Also it was Spangler's duty when a deposit was made to properly enter same on the customer's passbook, or give him a duplicate deposit slip or receipt therefor, at the same time making a proper deposit slip for the records of the bank.

It is also found by the trial court and shown by the record that at all times involved in this suit the Security National Bank and the Southwest National Bank were protected by indemnity insurance in the American Indemnity Company of New York by bankers' blanket bonds, and that the insurance of this company continued in force by rider attached to the bond in favor of the North Texas National Bank from the date it began business up to July 7, 1925.

On July 6, 1925, the Royal Indemnity Company of New York issued to the North Texas National Bank its bankers' blanket bond in the sum of $100,000, and this bond has been in force since its issuance so far as this litigation is concerned.

The first bond of American Surety Company was for $25,000, and agreed to indemnify against loss resulting:

"Through any dishonest act of the employees wherever committed, and whether committed directly or by collusion with others."

The later bond of American Surety Company was for $100,000, and in this bond the surety company undertook to indemnify the

bank to an amount not exceeding the amount of the bond, against:

"(a) Any loss through any dishonest or criminal act of any of the insured's officers, clerks, or other employees employed in, at or by any of the insured's offices covered hereunder, during the currency of this bond (All such officers, clerks, and other employees being hereinafter referred to as employees) wherever committed and whether committed directly or by collusion with others."

The bond of Royal Indemnity Company is to the same effect as the bond last above.

All bonds were in sufficient amounts to cover all losses claimed at the time they were in force.

■ Spangler's misappropriations of money and the dates thereof, as found by the Court of Civil Appeals, supported by the record were as follows:

On or before July 7, 1920,.........$ 1,087.63
On or before Aug. 14, 1922,...........778.22
On or before Sept. 20, 1922,.........7,964.60
On or before March 10, 1923,.......4,430.36
On or before July 9, 1923,...........6,540.45
On or before Jan. 23, 1924,..........8,485.97
On or before July 7, 1924,...........7,706.94
On or before July 7, 1925,..........1,577.11

Total .......................$38,571.28

From the above, it will be seen that all of Spangler's actual thefts or embezzlements of money actually took place prior to July 7, 1925, and at times when the bonds of the American Surety Company were in force and protecting the bank. All that he did after this time was to so manipulate the book and record entries of the bank as to conceal the thefts or embezzlements that had already taken place prior to that date. This he succeeded in doing until September 2, 1925. The record shows that in order to do this he followed the following method: When a depositor deposited money in the bank he would receive the deposit and put the money in the bank and give the depositor a proper receipt or duplicate deposit slip, or enter the amount in the customer's passbook; that at the same time he would make out a proper deposit slip for the records of the bank, but, instead of placing this slip in the records of the bank, he would withhold enough of these slips to cover up and conceal the amount of embezzlements he had already committed. The next day he would repeat the transaction by placing the deposit slip withheld by him on the previous day with the records of the bank, and then withhold others in the same manner. He had kept up these thefts and fraudulent transactions for years, always using the same method. However, it seems undisputed that no actual money was taken or abstracted after the bond of American Surety Company expired, though the fraudulent method of concealment continued for some time thereafter and while the bond of the Royal Indemnity Company was in force.

To state the matter in another way, the record shows that on September 2, 1925, the date the defalcations were discovered, and prior thereto back to and including July 7, 1925, all money received by Spangler passed into the coffers of the bank, and became a part of the common mass of the money or funds of the bank, and there is no evidence as to what the bank did with this particular money, but it must have been used as part of the general funds of the bank as any other funds. At all events, the money became the property of the bank to be disposed of and used by it as it saw fit. During the time the bond of Royal Indemnity Company was in force Spangler did withhold deposit tickets, but he did not steal or withhold money. The bank certainly could not suffer loss as a result of withholding deposit slips, but it could suffer loss by the abstracting or withholding of money. In other words, false entries, or fraudulent failure to make proper entries, however complicated, and however extended as to time, unaccompanied by the abstraction of money, may conceal and hide a loss already sustained, but they cannot create the loss itself. If a person steal my watch I have sustained the loss thereof when it is stolen, even though I do not find out the fact of my loss until long thereafter.

It is argued that Spangler diverted the money of the depositors when he received it, and did not make the proper book entries. We cannot agree to this. When Spangler received the deposits, they immediately became the property of the bank. While the bond of the Royal Indemnity Company was in force, he placed all money received with the assets of the bank, and it became a part of its general assets.

We therefore hold that in law the loss accrued within the contemplation of the several bonds at the time the money was actually abstracted, which was while the bonds of the American Surety Company were in force, and that the fact that the books and records of the bank were so manipulated as to conceal the loss, until a later date, and until such bonds had expired, did not operate to create a loss at such later time. Fidelity & Casualty Co. v. Consolidated Nat. Bank (C. C. A.) 71 F. 116, 119; State v. Atherton, 40 Mo. 209; Golden Seal Assurance Soc. v. Ætna Casualty Co., 207 App. Div. 628, 202 N. Y. S. 674, 678; Royal Indemnity Co. v. American Vitrified Products Co., 117 Ohio, 278, 158 N. E. 827, 829, 62 A. L. R. 407.

In Fidelity & Casualty Co. v. Consolidated Nat. Bank, supra, it is shown that an employer of the bank had embezzled the funds of the bank prior to the date the bond became effective, but during the life of the bond he

falsified the records of the bank so as to conceal the theft. The court in its opinion said:

"The loss in the contemplation of the parties was, as appears to us, that which the bank sustained by reason of the fraudulent abstraction of its money, and not any damage which it may have suffered in consequence of the subsequent prevention of its recovery of that loss under this bond."

In State v. Atherton, supra, it is said:

"If he [the Teller] merely made a misapplication of the money in the bank to the wrong account, but did not abstract or appropriate it, we do not see that the bank was the loser by it. If the evidence shows that all the money was taken from the bank and used while he was acting under another bond, the sureties on that bond will be alone liable."

In Golden Seal, etc., supra, the court says:

"The real defalcation occurred when the money was originally converted. The process of paying monthly transcripts with the receipts of other monthly transcripts constituted merely a device for concealing the original defalcation. Such device did not obliterate the original theft. Plaintiff's funds were lost when the money was first abstracted, and such loss has ever since existed."

In Royal Indemnity Co., etc., supra, it is said:

"That Cook committed an act of dishonesty and fraud toward his employer, the products company, when he first misapplied funds by failing to turn over to it the money received by him in payment of the accounts; that the Royal Indemnity Company would not be liable for any act of Cook which was done before the bond was executed, because the bond contains nothing which is retroactive in character, but is rather prospective; that the misappropriation of funds after the date of the bond, with which to pay his prior shortages, did not constitute a new pecuniary loss to the products company under the terms of the Royal Indemnity Company bond, for the reason that the products company had already sustained a pecuniary loss. The form of paying one customer's account out of the money collected from another customer did not change the amount of the loss, for such loss already existed."

We now come to consider the questions of rate of interest and limitation raised by the surety company.

■ In regard to the rate of interest recoverable, we hold that the Court of Civil Appeals was correct in its holding to the effect that, "The statute fixes the value of the use or detention of money, arising on written contracts where no rate of interest is agreed upon, at 6 per cent. per annum, and by analogy the same measure will be applied as damages where money has been converted." Article 5070, R. C. S. of Texas, 1925.

■ In regard to the issue of limitation, we hold that the four-year statute of limitation applies, as the suit is based on written instruments. Article 5527, R. C. S. 1925. This is also in accord with the holding of the Court of Civil Appeals.

The banks contend that the various superseded riders,· telegrams, and letters of the American Surety Company to the banks, operated in law to prevent the bar of limitation on all items of loss involved in this suit, and therefore no item of loss is barred by limitation. No instruments having this legal effect have been pointed out to us. This is also in harmony with the holding of the Court of Civil Appeals.

We therefore recommend that the judgments of the Court of Civil Appeals and the district court be both reversed and set aside, and judgment here entered as follows:

(a) That all judgments and recoveries of all parties against Royal Indemnity Company be denied, and that said company be, by this court, completely discharged with its costs.

(b) That as to all other parties the judgment of the Court of Civil Appeals and the district court be both reversed, and the cause as between them remanded to the district court for a new trial.

(c) That the North Texas National Bank and the Southwest National Bank together pay one-half the cost of this appeal, and the American Surety Company the other one-half.

CURETON, C. J.

Judgments of the district court and Court of Civil Appeals reversed, and judgment rendered for the Royal Indemnity Company, and as to all other parties the case is remanded to the district court.

We approve the holdings of the Commission of Appeals on the questions discussed in its opinion.