**WHITE DAIRY COMPANY, Inc., an Alabama Corporation, Plaintiff**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, a Minnesota Corporation, Defendant.**

Civ. A. No. 63–90.

United States District Court
N. D. Alabama, S. D.

Oct. 31, 1963.

As Amended Nov. 21, 1963.

Hogan, Callaway & Vance, Robert S. Vance, Birmingham, Ala., for plaintiff.

Lange, Simpson, Robinson & Somerville, and Edward O. Conerly, Birmingham, Ala., for defendant.

LYNNE, Chief Judge.

Suing upon a series of fidelity bonds, plaintiff claims damages in excess of $43,-000 sustained as the result of defalcations committed by its employee, Mrs. Jacqueline Chandler, extending over a period during which three bonds and one purported binder issued by defendant were in force.

On January 1, 1958, defendant issued to plaintiff its bond No. 400AA1728, which provided $2,500 coverage with respect to each of plaintiff's employees. On January 1, 1959, defendant issued to plaintiff its bond No. 400AA3547, which provided $2,500 coverage with respect to each of plaintiff's employees and by endorsement[1] provided $7,500 excess coverage (or a total of $10,000) for plaintiff's "Cashier". On January 1, 1960, defendant issued to plaintiff its bond No. 400 FR 261, which, together with the attached excess endorsement, provided $10,000 coverage with respect to plaintiff's "Cashier". On January 1, 1961, defendant's "Authorized Representative" in Birmingham, Molton, Allen & Williams, Inc., issued to plaintiff a "30 Day Binder", describing the risk bound as: "Extending present Blanket Bond in St. Paul—deleting Specific Excess Changing from Blanket Position Bond to Commercial Blanket Bond—Increasing Penalty from $2,500 to $100,000."

Each of such bonds was separate and complete in itself and was for an indefinite duration. Each was similar though not identical. Each succeeding bond expressly terminated or cancelled the bond previously in effect.

During the years 1958, 1959 and 1960, Mrs. Chandler embezzled cash both from daily receipts and from the Christmas and petty cash funds. Her duties included the handling of monies turned in daily by drivers of plaintiff's milk trucks and her *modus operandi* consisted simply in converting to her own use cash from company funds passing through her hands. The amounts handled by her were large and she was enabled to conceal her defalcations by applying one day's receipts to the funds for which she was accountable for the previous day. While "kiting" cash receipts to cover past withdrawals, she continued to make additional withdrawals in amounts ranging from $10 to $500. When her fraudulent appropriations were discovered on January 11, 1961, she had taken a total of approximately $43,609.96. No other employee of plaintiff was implicated in or responsible for such loss.

On or about April 3, 1961, plaintiff filed proof of loss in such amount, claiming $10,000 under defendant's 1960 bond insisting that it was issued on behalf of Jacqueline Chandler, employed in the position of Cashier.[2] Thereafter, on April 6, 1961, defendant rejected and returned such proof of loss by letter stating: " * * * our investigation has disclosed that Mrs. Chandler was not employed in the position of cashier by the White Dairy Company, Inc. and according to our bond, your (sic) company's coverage is $2500."

Admittedly, loose nomenclature was used in job descriptions in the White Dairy office in which Mrs. Chandler was employed. But this court expressed the opinion from the bench that she occupied the position of cashier included in the excess endorsements attached to the 1959 and 1960 bonds. Mature reflection has confirmed that impression. She was the sole custodian of the Christmas fund. Her primary responsibility was to receive and recapitulate the daily receipts after the drivers had checked in at the several windows. On the following morning she was required to lock the bag containing the funds and deliver it to Brinks for deposit in the bank. In short,

---

1. The evidence is undisputed that the effective date of such excess coverage endorsement was November 23, 1959.

2. On or about September 6, 1962, following defendant's denial of liability for any amount in excess of $2,500, plaintiff filed an amended proof of loss, claiming the entire amount of such loss under the 1958, 1959 and 1960 bonds, plus the thirty-day binder.

she had charge of the money which belonged to plaintiff.

Consideration of the effect of the purported thirty-day binder and the authority of its local representative to obligate it in the amount stated therein and to the terms of a Commercial Blanket Bond "in ordinary use by the Company" is pretermitted for the reason that the undisputed evidence reveals that Mrs. Chandler committed no act of embezzlement after December 31, 1960.

■ The vital nub of the controversy between the parties is their disagreement as to the total extent of defendant's liability under the three bonds in question. Plaintiff contends that, without benefit of the thirty-day binder, it is $22,500. Defendant, laying to one side its contention that Mrs. Chandler was not plaintiff's cashier, insists that it could not exceed $10,000.

It must be conceded that a company engaged in issuing fidelity bonds may, by clear and unambiguous language, limit its liability to a single stated amount. This is so whether its obligation is continuing or separate and distinct from year to year. Of course the problem of the draftsman is complicated by a choice of words which will, at the same time, attempt to confine the protection afforded to that for which the premium is fixed and charged without putting the insured on notice that it may obtain the coverage it requires by changing companies each year.

The cases which have considered the problem have approached it from a consideration of the nature of the obligation assumed by the insurer, whether the indemity afforded is continuing from year to year or is separate and distinct for each year involved. While it might be of academic interest to analyze and attempt to reconcile the cases collected in the margin,[3] this court is content to observe that language efficacious to limit total liability to a stated amount when the obligation is a continuing one might be ineffective where the fidelity insurer issues a separate and distinct bond each year.

That a determination of the issue of liability under a fidelity bond, or bonds, effective in successive years, transcends a mere exercise in semantics is graphically illustrated by two opinions from the same court.

In Massachusetts Bond. & Ins. Co. v. Julius Seidel Lbr. Co., 279 F.2d 861 (8th Cir. 1960), Judge Sanborn, in this court's opinion, reached the right result by concluding from the language used in the basic contract and the "schedule adjustment lists" that there was a continuing obligation. At page 865 of 279 F.2d he points out that "[t]*here was no termination of the bond or policy*, no change in annual premium, and only an insignificant change in the schedule coverage for losses attributable to Feldmeier." (Emphasis supplied.)

Fifteen years before, in the case of Globe Indemnity Co. v. Wolcott & Lincoln, 152 F.2d 545 (8th Cir. 1945), he

3. United States v. American Surety Company of New York, 172 F.2d 135, 7 A.L.R.2d 940 (2d Cir. 1949); Standard Accident Insurance Co. v. Collingsdale State Bank, 85 F.2d 375 (3d Cir. 1936); Columbia Hospital v. United States F. & G. Co., 88 U.S.App.D.C. 251, 188 F. 2d 654 (1951); Maryland Casualty Co. v. First National Bank of Montgomery, 246 F. 892 (5th Cir. 1918); New York Casualty Co. v. Ford, 145 F.2d 599 (5th Cir. 1944); Aetna Casualty & Surety Co. v. Commercial State Bank of Rantaul, 13 F.2d 474 (D.C.E.D.Ill.1926); United States F. & G. of Baltimore v. Crown Cork & Seal Co. of Baltimore City, 145 Md. 513, 125 A. 818 (Ct.App.Md.1924); Krey Packing Co. v. Employers' Liability Assurance Corp., 127 S.W.2d 780 (St. Louis Ct.App.1939); City of Middlesboro v. American Surety Co. of New York, 306 Ky. 367, 211 S.W.2d 670 (1948); Great American Indemnity Co., et al. v. State, 229 S.W.2d 850 (Civ.App.Tex. 1950); United States Fidelity & Guaranty Co. v. Barber, 70 F.2d 220 (6th Cir. 1934); American Bonding Co. of Baltimore v. Morrow, 80 Ark. 49, 96 S.W. 613 (1906); Commercial Bank v. American Bonding Co., 194 Mo.App. 224, 187 S.W. 99 (1916).

dealt with two bonds which he held to be separate obligations. Pertinent to our problem, he wrote:

> "The provision of paragraph 4 of the rider attached to the second bond that 'liability under the prior bond and the attached bond on account of any office shall not be cumulative in amounts,' cannot, we think, be taken and understood to be a limitation of the aggregate amount of the liabilities of the appellant under both bonds. The liability of the appellant under the first bond and its liability under the second bond were not cumulative liabilities, but were separate liabilities, for separate amounts, under separate contracts of insurance. *Hence an agreement that these distinct liabilities should not be cumulative in amounts would be meaningless.*" (Emphasis supplied.)

Turning now to the contracts upon which plaintiff's claims are rested, it may be stated categorically that the three bonds are separate and distinct, the 1959 bond expressly terminating the 1958 bond and the 1960 bond expressly terminating the 1959 bond.

Each bond expressly agrees to indemnify plaintiff for any loss sustained by it through any act of fraud or dishonesty committed by any employee subsequent to the effective date of the bond and prior to its cancellation while the bond was in force as to the employee causing the loss and which loss is discovered not later than three years following the cancellation of such bond as an entirety.[4]

In 1958, Mrs. Jacqueline Chandler, plaintiff's cashier, embezzled in excess of $2,500; in 1959 and 1960, respectively, she embezzled in excess of $10,000. The loss in each year was discovered January 11, 1961, well within the three-year period of each bond.

With reference to the limit of liability (excluding excess insurance) each bond provides: "The sum of $2,500.00 shall be available on account of each Employee whose dishonest or fraudulents act(s) shall cause or contribute to any loss(es) covered by this Bond, and the payment of premiums during the currency of this Bond shall not render such sum *cumulative* from year to year or period to period * * *." (Emphasis supplied.)

Plaintiff paid premiums for the bonds in force in 1958 in the amount of $554.63; in 1959, in the amount of $747.37, and in 1960, in the amount of $1,059.74. The increasing premiums were apparently attributable to the broadening of the coverage from year to year.

The condition of each bond, captioned "Continuity of Prior Coverage", has a dual aspect. Paragraph E(1)[5] provides indemnity for any loss occurring during the term of any prior bond, *whether or*

4. "THE ST. PAUL FIRE AND MARINE INSURANCE COMPANY (herein called Company), in consideration of the premium(s), agrees to indemnify the Insured for all loss which the Insured shall sustain through any act(s) of fraud or dishonesty committed anywhere, alone or in collusion with others, subsequent to noon of the date of this Bond and prior to its cancellation, by any Employee or Employees * * * while this bond is in force as to the Employee or Employees causing such loss, and which loss is discovered not later than 3 years following the cancellation of this Bond as an entirety, as hereinafter provided, including, without limiting the generality of the foregoing, * * *."

5. This Bond applies to any loss occurring during the term of any prior bond or bonds or policy or policies of insurance, herein referred to as prior insurance(s), carried by the Insured, provided (a) such loss is one to which the coverage of this Bond would have applied had the loss occurred during the effective period of this Bond, and (b) that such prior insurance(s) had not terminated prior to the date of this Bond, and (c) that the period allowed for discovery of loss under such prior insurance(s) had elapsed prior to the discovery of such loss, and (d) that the Company shall be liable for no more than the amount of coverage in effect under such prior insurance(s) when the loss occurred, or the amount of the indemnity granted by this Bond, whichever is less.

*not issued by defendant Company*, if (a) defendant's bond would have covered such loss had it occurred during its effective period, and (b) such prior insurance had not terminated prior to the date of defendant's bond, and (c) the discovery period under such prior insurance *had elapsed* prior to the discovery of such loss, provided (d) defendant's liability would be limited to the amount of coverage afforded by the prior bond or the amount of indemnity granted by its bond, whichever is less.

While the foregoing condition is inapplicable to the facts of this case, it sheds light on the proper construction to be placed on the critical language of paragraph E(2),[6] identical in each of the defendant's bonds involved herein. To synopsize, it is provided thereby that if the discovery period of the 1958 bond issued by defendant had not elapsed at the time the 1959 bond was substituted for the 1958 bond, defendant's liability under the 1959 bond and under the 1958 bond would not be cumulative as to any losses caused by Mrs. Chandler. Of course the same analysis applies to the 1960 bond.

It seems to the court that there is no ambiguity when this condition is placed in proper perspective with the general insuring clause of the bond, although this may be an oversimplification. Its function may be illustrated by suppositions— assume that the coverage afforded plaintiff as to Mrs. Chandler in 1958 was $2,500, in 1959, $10,000 and in 1960, $10,000, and that she embezzled the sum of $5,000 in 1958, the sum of $15,000 in 1959 and the sum of $2,500 in 1960. The limitation against cumulative liability under the 1960 bond, if it is not meaningless, would prevent the carry forward of the excess of $2,500 for 1958, and that of $5,000 for 1959 and the aggregation

of such amounts with the 1960 loss to claim the full penalty of the 1960 bond. Under the assumed facts the total liability of defendant under its separate and distinct obligations would be $15,000 and not $22,500.

The foregoing construction achieves the identical result which would have obtained had plaintiff placed its fidelity insurance with separate and independent insurers for each of these three years.

■■  Each of these bonds is an Alabama contract to which the substantive law of this state is applicable. No Alabama case of persuasive authority has been called to the court's attention; the court has found none. It therefore becomes its duty to forecast what the Supreme Court of Alabama would hold in a case presenting the same facts.

In the leading case of Louis Pizitz Dry Goods Co. v. Fidelity & Deposit Co., 223 Ala. 385, 136 So. 800 (1931) are to be found the following guide lines:

"*  *  *  doubtful language in [fidelity bonds] is to be construed most favorably to the insured.

"This rule, however *  *  *  is not to be carried to the extent of construing such a contract contrary to the manifest intention of the parties, for such intention is the 'pole star' of all rules of construction."

The fact that plaintiff carefully reviewed its entire insurance program in the fall of each year and received at least one other bid for a fidelity bond from another insurer, the logic of inferring that defendant employed the critical language of the condition to deter the insured from changing companies from year to year (See: 27 Michigan Law Review 442, 447; 1 Buffalo Law Review 186) and the intention of the parties drawn from the four corners of the in-

---

6. Where the period allowed for discovery of loss under another or other bond or bonds or policy or policies of insurance, herein referred to as prior insurance(s), issued by the Company to the Insured, had not elapsed at the time of the substitution of the coverage of this Bond for the coverage of such prior insur-

ance(s), the Company's liability under this Bond and under such prior insurance(s) shall not be cumulative as to any loss(es) caused by any act(s) or omission(s) of any one person or act(s) or omission(s) in which such person is concerned or implicated.

strument combine to support the court's construction. With deference to the contention of defendant, any other translation of the crucial language would result in "holding a hope to the ear only to break it to the promise."

It appears that the Excess Indemnity Endorsement attached to the 1959 bond was amended to provide excess indemnity on Mrs. Chandler, as cashier of White Dairy, in the amount of $7,500 and that such amendment became effective as of November 23, 1959. While plaintiff established a loss due to acts of embezzlement on the part of Mrs. Chandler in the year 1959 in excess of $10,000, the question remains as to whether plaintiff carried its burden of proving that it actually sustained a loss in excess of $2,500, covered by the Dishonesty of Employees Insuring Agreement, from and after November 23, 1959.[7]

The evidence is that Mrs. Chandler abstracted sums ranging from $10 to $500 and that she always took money from petty cash and the Christmas fund; that the petty cash fund did not exceed $1,000, and the Christmas fund in each year was paid off or distributed to the participating employees "close to the end of November." Logic and the weight of authority support the conclusion that the incidence of the loss to plaintiff, for which it is entitled to be indemnified, was each act of taking by Mrs. Chandler rather than the deferring of future deposits to conceal her misappropriations.

In the pre-Erie case of Aetna Casualty & Surety Co. v. First Trust & Savings Bank, 62 F.2d 316 (5th Cir. 1933), Judge Sibley, with customary clarity and simplicity, declared the rule of reason:

"It is argued that thus after July 6, 1929, Anderson had repaid all that he had taken previously, and was short only the money last taken in for which deposit slips were being withheld at the time of discovery. The reasoning is wholly fallacious. The money taken on general deposit became at once the money of the bank, all of it. Whenever Anderson took out any actual money a loss occurred to the bank. By putting new deposits into the bank's cash he paid nothing back, but only put the bank's own money where it belonged." [8]

There is no evidence from which it can reasonably be inferred that Mrs. Chandler embezzled any of plaintiff's funds between November 23 and December 31, 1959. It follows that plaintiff is entitled to recover of defendant the sum of $2500 for each of the years 1958 and 1959, and the sum of $10,000 for the year 1960, a total of $15,000.

7. Continental Casualty Co. v. First National Bank, 116 F.2d 885 (5th Cir. 1941); National Bank of South Carolina of Sumpter v. American Surety Co. of New York, 67 F.2d 131 (4th Cir. 1933); McPhillips v. McGrath, 117 Ala. 549, 23 So. 721 (1897); National Surety Co. v. State, 219 Ala. 609, 123 So. 202 (1929); Hartford Acc. & Indmn. Co. v. Hattiesburg Hdw. Stores, 49 So.2d 813, 23 A.L.R.2d 1053 (Miss.1951); Village of Plummer v. Anchor Cas. Co., 240 Minn. 355, 61 N.W.2d 225 (1953); 50 Am.Jr. Suretyship, Sec. 357.

8. Accord: Royal Indemnity Co. v. North Texas National Bank, 25 S.W.2d 822 (Tex.Com.App.1930); Fidelity & Casualty Co. v. Consolidated National Bank, 71 F. 116 (3rd Cir. 1895); Employer's Liability Assurance Corp., Ltd. v. State ex rel. Union Trust Company of Franklin, 110 Ind.App. 86, 34 N.E.2d 936 (1941); Golden Seal Assurance Soc. v. Aetna Casualty & Surety Co., 207 App. Div. 628, 202 N.Y.S. 674 (1924); Royal Indem. Co. v. American Vitrified Products Co., 117 Ohio St. 278, 158 N.E. 827, 62 A.L.R. 407, (1927).

Compare: American Bonding & Trust Co. of Baltimore City v. Milwaukee Harvester Co., 91 Md. 733, 48 A. 72 (1900); White and Bollard, Inc. v. Standard Accident & Insurance Co., 175 Wash. 174, 27 P.2d 123 (1933); Pine County v. Willard et al., 39 Minn. 125, 39 N.W. 71, 1 L.R.A. 118; Fidelity & Deposit Co. of Maryland v. Cunningham, 177 Ark. 638, 7 S.W.2d 332 (1928).