**UNITED STATES v. AMERICAN SURETY CO. OF NEW YORK.**

No. 95, Docket 21089.

United States Court of Appeals
Second Circuit.

Jan. 25, 1949.

---

SWAN, Circuit Judge, dissenting.

———◆———

Cyril Coleman, of Hartford, Conn. (David R. Hubbard and Day, Berry & Howard, all of Hartford, Conn., on the brief), for defendant-appellant.

Edward J. Lonergan, Asst. U. S. Atty., of Hartford, Conn. (Adrian W. Maher, U. S. Atty., of New Haven, Conn., on the brief), for plaintiff-appellee.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This action is upon a surety bond in the penal sum of $2,000 securing the faithful performance of his duties by one Welge, a clerk in the Post Office at Essex, Connecticut. It was dated October 26, 1935, and had no stated period of duration. Its condition was "that if the said employee shall, on and after October 26, 1935, faithfully discharge all the duties and trusts imposed on him as such heretofore designated employee * * * then this obligation shall be void; otherwise, of force." The bond also contained a statement that "the premium of this bond is $0.65 per $1,000," with the "total premium charged $1.30."[1] Each year thereafter the employee paid a like amount for renewal of the bond until November 27, 1944, when it was discovered that he had been guilty of a series of embezzlements beginning in 1935. These amounted to $7,949.72, but, after deducting certain recoveries effectuated from him, amounted in net sum to $3,865.97, dating from 1938. The defalcation in any one year never exceeded $2,000. Defendant as surety admitted its liability for $2,000 as the face amount of the bond as originally written and tendered payment of that amount. The district court, however, in a reasoned opinion, D.C.Conn., 77 F.Supp. 318, sustained the plaintiff's contention for recovery of the full amount and gave judgment for it with interest, amounting to a total of $4,610.17. This appeal followed.

The bond was on the form prescribed by the Post Office Department and was given pursuant to statutory law and postal regulations. Nevertheless, the answer to the question of its coverage or, to use the not wholly informative labels employed by the parties, the question whether the penalty is cumulative, as asserted by the plaintiff, or merely continuous, as contended by the defendant, remains one of some difficulty. No cases directly in point have been discovered and we must proceed in the light of the wording of the contract against its background, aided by the incomplete analogy of other cases involving bonds of comparable, but not exactly similar, wording. We are not helped by Connecticut law—to whatever extent it might be considered applicable—because in the only Connecticut case involving a similar provision the court found it unnecessary to consider its effect. Town of Enfield v. Hamilton, 112 Conn. 314, 152 A. 285.

■ Under the governing federal statute the Postmaster General may require that certain postal employees "shall, before en-

---

[1] It also contained the statement that "the amount of premium charged for a like bond during the year 1908 was $2.00 per $1,000." This information was required because of the statute prohibiting a charge in excess of the 1908 rate, 6 U.S.C.A. § 14, which also prohibits payment of the premium by the United States.

tering upon the duties of their office, give bond to the United States with good and approved security, and in such penalty as the Postmaster General shall prescribe, conditioned for the faithful discharge of all duties and trusts imposed upon them." 39 U.S.C.A. § 132. Postal Laws and Regulations § 473 provides that the bonds of all employees of first- and second-class post offices, in which group the employee here is included, shall be "in accordance with the forms prescribed by the department." By express statute the liability of a surety on an official bond continues and covers "the period of service ensuing until the appointment and qualification of the successor of the principal." 6 U.S.C.A. § 3; 26 Op. Atty.Gen. 70. True, a new bond for the postal employee may be substituted under the procedure stated in 39 U.S.C.A. § 815; but when the substitution is accomplished the sureties in the prior bond are only released from responsibility for defaults of the principal committed "subsequent to the day such new bond becomes operative." Hence liability for a default of this principal occurring in any one year would continue, whether or not a renewal premium was paid for a later year. The strength of the plaintiff's position lies in this fact, plus, of course, the generality of the language used in the bond and the absence of express limiting provisions. On defendant's theory an embezzlement of $2,000 or more occurring in a single year would exhaust its coverage, notwithstanding the payment of later premiums and the existence of later defaults. Plaintiff contends that this could not have been intended and, referring incidentally to the premium charge for "this bond," asserts that successive renewals constituted successive new agreements to the extent of $2,000 each.

■ Defendant's first argument goes back to the statute cited providing for continuing liability upon official bonds. 6 U. S.C.A. § 3. In its original form it required that such bonds be renewed at least every four years; but it was amended in 1928 at the instance of the Post Office Department to provide that "the payment and accept-

ance of the annual premium on corporate surety bonds furnished by postal officers and employees * * * shall be a compliance with the requirement for the renewal of such bonds" within the statutory meaning. 45 Stat. 247. This amendment was designed to eliminate the uneconomical and unnecessary renewal procedure for bonds written by Treasury-supervised surety companies.[2] The Department retained the power, under the statute, to require renewal where it thought such action necessary. There seems no reason to assume that this provision, so obviously in line with administrative convenience generally, particularly in the case of bonds of small amount, was intended to limit drastically the coverage which the Government had otherwise had for its employees. It would thus have forfeited entirely even the very definite effect of the previous quadrennial renewals of all bonds. We think the change should be considered limited to its stated purpose.

■ Defendant's next argument is based upon the permission accorded Government employees, in lieu of filing a fidelity bond, of depositing Government securities "in a sum equal at their par value to the amount of such penal bond required to be furnished." 6 U.S.C.A. § 15. Its claim is that, since presumably a cumulating deposit of security would not be required, so the alternative provision for an annual premium provision cannot have been intended to make the security in the bond cumulative. But the deposit provision exists side by side in the statutes with the original quadrennial renewal provision, and it seems particularly unlikely that Congress would have meant not to protect the Government by annual premiums paid to the same insurer, when protection could have been obtained merely by application to another surety company. We are told by counsel for the Government that no deposits of securities have ever been made, and hence there is no administrative practice to offer the light of experience. Whatever may turn out to be the proper interpretation of the deposit provision, we think it cannot be held to

[2] H.R.Rep.No.383, Committee on the Post Office, Jan. 24, 1928; Cong. Rec., Mar. 2, 1928, at 3936 (Senator Phipps reporting for the Committee on Post Offices and Post Roads).

limit the force of the requirement for an annual additional premium.

█ Finally to meet the point that the obligee, in cases where the bond penalty has already been exhausted by defaults, obtains nothing from the renewal, defendant urges that the continuous form of bond obviates the necessity of proving the particular period in which the defalcations took place. Leonard v. Aetna Casualty & Surety Co., 4 Cir., 80 F.2d 205, 207. How important a practical consideration this may be is not clear; one suspects it is more bookish than real in cases of substantial and proven embezzlements of postal clerks. But in any event, such a detail of proof can hardly offset the very real need of a right to collect the amount of the bond for each of the years in which a defalcation occurs.

Turning to the cases, those which contain language rather clearly negativing cumulative liability are not in point. Thus in Hack v. American Surety Co. of New York, 7 Cir., 96 F.2d 939, 948, certiorari denied 305 U.S. 631, 59 S.Ct. 95, 83 L.Ed. 435, the bond declared that "in no event" should the surety's aggregate liability for any one or more defaults of the principal during any one or more years exceed the amount stated in the bond. In Aetna Casualty & Surety Co. v. First Nat. Bank of Weatherly, Pa., 3 Cir., 103 F.2d 977, the surety's liability was to "continue in the amounts scheduled" until the insurance was terminated. In Leonard v. Aetna Casualty & Surety Co., supra, the surety was liable only for losses discovered within two years after the termination of the bond, thus showing an intent against cumulative responsibility. In Brulatour v. Aetna Casualty & Surety Co., 2 Cir., 80 F.2d 834, there was evidence in the subsequent actions of the parties that they regarded the liability as continuous, and when one of the annual schedules filed with the bond explicitly provided that the renewal premium would not create cumulative liability, the obligee voiced no objection. None of these cases is thus particularly helpful.

Where the language of the bond is more general, the courts appear to be in disagreement. Those that find continuous, rather than cumulative, liability stress the absence of specific provisions for termination and renewal and the fact that the bond is stated to be for an indefinite term. Montgomery Ward & Co. v. Fidelity & Deposit Co. of Md., 7 Cir., 162 F.2d 264. Thus the bond has been likened to a term life insurance policy, Fourth & First Bank & Trust Co. v. Fidelity & Deposit Co. of Md., 153 Tenn. 176, 281 S.W. 785, 45 A.L.R. 610, though the analogy seems unpersuasive; a man has only one life, while a postal clerk may be guilty of many embezzlements.

On the other hand, the courts which find cumulative liability seem to be more impressed by practical considerations. "We are the more persuaded to this view by the improbability that a practical business concern * * * would pay one company two premiums for a single right of recovery if it could by payment of the same sum to two separate insurance carriers procure recoverable insurance for two periods." Standard Accident Ins. Co. v. Collingdale State Bank, 3 Cir., 85 F.2d 375, 376. In Aetna Casualty & Surety Co. v. Commercial State Bank of Rantoul, D.C.E.D.Ill., 13 F.2d 474, 476, reversed on other grounds, 7 Cir., 19 F.2d 969, the court asks the pertinent question, "What did he [the obligee] buy the second year?" and concludes that he must have bought a new contract of insurance. In Maryland Casualty Co. v. First Nat. Bank of Montgomery, Ala., 5 Cir., 246 F. 892, 900, certiorari denied 246 U.S. 670, 38 S.Ct. 345, 62 L.Ed. 931, the court points out that the renewal premium was equal in amount to the initial premium, and that therefore it should provide equal coverage, without diminishing the coverage for undiscovered defalcations in the previous period.

█ We agree with Judge Smith in regarding these considerations as persuasive. It does not seem rational to believe that the United States would require a contract from a surety of so little practical value or that a company in business as a paid surety would be justified in contemplating that it had promised so little. Other considerations, such as that the premium was paid by the clerk, not by the Government, and that the bond was required by it as a condition of the employment, do not militate against this conclusion. Such considerations may concern and affect the compensation for the

office; they can hardly be employed to limit or nullify the conditions themselves. Nor does the fact that the bond was on a Government form suggest enough doubt to call for construction against the obligee. The substantial and controlling point is that an annual premium was required and paid in the expectation of the obvious protection which that should afford.

Affirmed.

SWAN, Circuit Judge (dissenting).

This bond is on a printed form prepared by the Government. Under a familiar canon of construction,[1] ambiguities, if any, in the instrument should be construed against the draftsman, but in my opinion the bond is not ambiguous. Its express terms, as well as the relevant statutory provisions applicable to bonds given by postal employees, indicate a continuing, not an annually cumulative liability.

It runs for the principal's term of service[2] and the stated penalty is $2,000, whether the term turns out to be one year or ten years. It states "Total premium charged $1.30," and contains no provision that the principal shall pay an annual premium.[3] Hence payment of the stated premium gave the obligee of the bond protection in the amount of $2,000 throughout the principal's term of service, whether or not additional sums were collected by way of annual premiums under some collateral agreement with the principal. If the obligee at any time considered the bond insufficient security, the relevant statutes provided a remedy. Thus, the Postmaster General may require the execution of a new bond whenever he deems it expedient. 39 U.S.C.A. § 815. By the provisions of 6 U.S.C.A. § 2, every two years an examination is to be made by the officer required to take and approve a bond to ascertain not only the sufficiency of the sureties but also the sufficiency of the amount of the bond. Under 39 U.S.C.A. § 814 the Postmaster General may, in accordance with regulations which he shall subscribe, accept from a postal employee United States Liberty Loan bonds in lieu of a surety bond. The Government securities so substituted must have a par value equal to the amount of the surety bond required to be furnished. 6 U.S.C.A. § 15. It is obvious that these provisions permitting the deposit of $2,000 of Government securities in place of a surety bond for that amount, did not contemplate that an employee who took advantage of them must annually thereafter throughout his term of service post additional securities of like amount. Since there is no "cumulative" liability imposed on the employee who elects to post securities in lieu of a surety bond, it seems to me wholly inconsistent to impose such liability on one who elects to give a bond instead of posting securities.

The fact that the surety collected annual premiums from the principal may justify an inference of a collateral agreement between them as to such payments, but I am unable to see how the existence of such an agreement justifies converting a contract of continuing liability in the stated amount of $2,000 into a series of contracts each of which imposes liability in the amount of $2,000. It seems highly improbable that the surety would voluntarily incur a maximum liability of $20,000 for $13 (assuming the employee's term of service should continue for ten years) and certainly the bond does not express such an intention. Consistent with this view but inconsistent with the idea that cumulative liability was intended is Instruction 9, printed on the back of the bond.[4]

---

[1] Williston on Contracts, Rev. Ed., § 621.

[2] 6 U.S.C.A. § 3: "* * * The liability of the principal and sureties on all official bonds shall continue and cover the period of service ensuing until the appointment and qualification of the successor of the principal. * * *"

[3] 6 U.S.C.A. § 14 forbids payment by the United States of any part of the premium of a bond.

[4] "Instructions."

"1. It is not required that both corporate and individual surety be furnished, and either kind will be accepted.
* * * * *
"9. The individual sureties must justify, in sums, in unincumbered real estate, equal in the aggregate to double the penalty of the bond, before a notary public, justice of the peace, or other officer authorized to administer oaths, except a postmaster."

Concededly there is no decision involving a bond of identical terms. But I see no material difference between the bond at bar and the one construed in Montgomery Ward & Co. v. Fidelity & Deposit Co. of Md., 7 Cir., 162 F.2d 264. I think we should follow that case and our own dictum in Brulatour v. Aetna Casualty & Surety Co., 80 F.2d 834, 836, where we said: "The authorities * * * illustrate the rule that, where the bond is for an indefinite term, the date it begins to run being the only date given, the fact that the premiums were paid annually does not make the relation a series of separate yearly contracts."

In my opinion the judgment should be reduced to $2,000.