Herbert TILLERY, et al., Petitioners,

v.

**DISTRICT OF COLUMBIA CONTRACT APPEALS BOARD, Respondent.**

Ambush Group, Inc., Intervenor.

No. 04–AA–1363.

District of Columbia Court of Appeals.

Argued Oct. 25, 2006.

Decided Dec. 21, 2006.

William J. Earl, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the brief was filed, and Edward E. Schwab, Deputy Attorney General, were on the brief, for petitioner.

Samuel N. Omwenga, Washington, DC, for intervenor.

Before FISHER and THOMPSON, Associate Judges, and NEWMAN, Senior Judge.

NEWMAN, Senior Judge:

The District of Columbia seeks review of a decision of the District of Columbia Contract Appeals Board ("the CAB") relating to the District's contract with intervenor Ambush Group, Inc. ("Ambush Group"), a

telecommunications consulting business. The District argues that the CAB misinterpreted the contract when it found that the scope of work provision included an audit of telecommunications *equipment* in addition to telecommunications *lines and circuits*. We hold that the contract unambiguously limited Ambush Group's scope of work to a "line and circuit" audit. Because the integrated contract is clear on its face, the CAB erred in interpreting the integrated contract in light of extrinsic evidence. We reverse the CAB's decision.

## I.

In December 1993, the District entered into a contract with Ambush Group to provide telecommunications auditing services. The contract contains a scope of work provision, which incorporates the District's request for proposals ("RFP") and select portions of Ambush Group's Best and Final Offer ("BAFO") sent in response to the RFP.

In the RFP, the District announced a requirement for "contractor services to audit [the District's] telephone lines and circuits." The subject line states, "Procurement of Services to Audit Telephone Lines and Circuits." The RFP then gives a general description of the local government's assortment of telephone lines and data circuits and indicates that cost savings might be achieved from the conversion of its telephone line system. In that same paragraph, the RFP states that "[t]he government also requires an audit to verify the accuracy of invoices." The next paragraph begins by reiterating that "[t]he government requires the services of a contractor to identify all line and circuit billing errors,

including, but not limited to, those described above." The RFP then requests prospective offerors to submit "proposals describing how the above work would be undertaken...."

In response to the RFP, Ambush Group submitted the BAFO, delineating a six-phased approach to the proposed audit. The introduction to the BAFO notes that since the 1984 divestiture of AT & T "many organizations with leased AT & T equipment and/or Centrex systems have been erroneously billed for a variety of reasons...." The BAFO introduction also proposes to "interpret the Public Service Commissions [sic] tariffs as they relate to leased AT & T equipment," compare "current on-site equipment ... to what you are being billed and determine billing errors," and submit "projected refund analysis reports to AT & T...."[1]

On December 20, 1993, the District and Ambush Group entered into a contract that contains a scope of work provision incorporating the RFP and portions of the BAFO. The contract does not incorporate the introduction to the BAFO. Article VIII of the contract, titled "Order of Precedence" provides that "[a]ny inconsistencies in this contract shall be resolved by giving precedence" first to the language of the contract document itself, followed by the RFP and ending with the select portions of the BAFO. Thus, the contract's scope of work provision is as follows:

### Article I—Scope of Work

The Contractor will perform telephone line and circuit auditing services for approximately 21,000 Centrex lines, various XMB lines associated with PBX at

---

1. It is undisputed that the terms "line," "circuit," and "equipment" are terms of art within the telecommunications industry. A line is the channel through which voice or data are transmitted along a circuit. Together, a line and circuit are often referred to as a dial tone. "Equipment" is the hardware, such as a telephone or computer, connecting the lines and circuits.

the Reeves Center, 500 1MB lines and approximately 1,000 data circuits. The Government requires that the Contractor identify all line and circuit billing errors, including, but not limited to, those described above, in accordance with the following:

A. Request for Proposals (RFP) No. 4043–AA–NS–6–GM issued November 8, 1993 . . .

B. Following sections of AGI Best and Final Offer dated 11/23/93 in response to RFP No. 4043–AA–NS–6–GM . . .

1. Phase I—Items 1 through 4

2. Phase II—Items 1 through 8

3. Phase III—Items 1 through 6

4. Phase IV—Items 1 through 7

5. Phase V—Items 1 through 10 and Item 11 revised . . .

6. Phase VI shall be deleted in its entirety as written and the following shall be inserted in its place. . . .

\* \* \* \*

The relevant portions of the incorporated BAFO sections are as follows:

### Phase I

1. Describe the project in a general meeting of the telephone coordinators to be convened by the government within seven working days of contract award.

2. Gather required documentation from C & P Telephone Company (SCR), AT & T and other circuit vendors that provides [sic] circuitry for each agency.

3. Decode, analyze and recap monthly charges billed by C & P Telephone Company, AT & T and other circuit vendors.

4. Generate a documented listing of all circuitry included in the billings provided by C & P Telephone Company, AT & T and circuit vendors.

### Phase II

1. Work directly with the telephone coordinators of the 60 to 65 agencies to schedule appointments for on-site analysis of their respective agency. . . .

2. Perform an on-site inventory by actual physical count of all circuitry for each of the agencies in the Government.

3. Verify existence of circuitry through empirical evidence, dialing telephone lines and/or testing lines electronically.

4. Interview on-site telephone coordinators to further validate circuit discrepancies and unused circuitry. Obtain a list of on-site telephone users.

5. Prepare a comparative analysis of the information disclosed from the records of C & P Telephone Company, AT & T and other circuit vendors versus the actual count recorded during the on-site physical inventory.

6. Generate a formal audit report detailing the billing errors disclosed by the comparative analysis.

7. Prepare a formal claim for any refunds due from C & P Telephone Company, AT & T and other circuit vendors.

8. Submit the formal audit report claim(s) for refunds to the Contracting Officer of the District of Columbia and the telephone coordinators for review and final approval.

### Phase III

1. Perform a savings analysis of the D.C. Government's telecommunications system to identify unused lines.

2. Identify lines which are not being used based on the results of the on-site inventory.

3. Verify existence of circuitry through empirical evidence, dialing telephone lines and/or testing lines electronically. Verify status of lines with the agency's on-site telephone coordinator.

4. Identify the lines to be disconnected and under the authority of the Contracting Officer notify the on-site agency telephone coordinator of the intent to disconnect.

5. Compile a list of lines to be disconnected after the coordination and confirmation of the disconnection with the on-site agency telephone coordinator.

6. Calculate fiscal year (FY) 1994 savings projected from the disconnection of identified unused lines and equipment.

### Phase IV

1. Analyze the 1MB service to determine the percentage of savings to be realized by the conversion from 1MB lines to Centrex lines.

\* \* \* \*

5. Identify 1MB lines to be converted to Centrex service and . . . notify the on-site agency telephone coordinator of the intent to convert service.

\* \* \* \*

7. Calculate the fiscal year (FY) 1994 savings to be realized by the conversion of the identified 1MB lines to Centrex service.

### Phase V

1. Gather required documentation from C & P Telephone Company (CSR), AT & T and other circuit vendors that provide data circuitry for each agency.

2. Decode, analyze and recap monthly charges billed by C & P Telephone Company, AT & T and other circuit vendors for data circuits.

3. Generate a documented listing of all data circuits included in the billings provided by C & P Telephone Company, AT & T and circuit vendors.

4. Perform an on-site inventory by actual physical count of all data circuits for each of the agencies in the Government.

5. Verify existence of data circuitry through empirical evidence and/or test lines electronically.

\* \* \* \*

7. Prepare a comparative analysis of the information disclosed from the records of C & P Telephone Company, AT & T and other data circuit vendors versus the actual count recorded during the on-site physical inventory.

8. Generate a formal audit report detailing the billing errors disclosed by the comparative analysis.

9. Prepare a formal claim for any refunds due from C & P Telephone Company, AT & T and other circuit vendors.

10. Submit the formal audit report claim(s) for refunds to the Contracting Officer of the District of Columbia and the telephone coordinators for review and final approval.

11. Calculate fiscal year (FY) 1994 savings to be realized by analyzing the identified data circuits.

While the contract document itself and the RFP do not mention "equipment" or "AT & T," phases I, II and V of the BAFO mention "AT & T," and Phase III, item 6 references "equipment." Article X, titled "Total Agreement" provides that "[t]his contract, including specifically incorporated documents constitute the total and entire agreement between the parties. All previous discussions, writings and agreements are merged herein."

The instant action began on May 29, 1997, when Ambush Group filed a notice of appeal with the CAB, alleging that the District had refused to pay Ambush Group for services performed under the contract.[2]

---

**2.** Ambush Group filed the notice of appeal in response to a letter received on May 1, 1997

from the Department of Administrative Services, informing Ambush Group that the con-

In the formal complaint, Ambush Group alleged that the District realized a savings of $409,877.93 from AT & T due to Ambush Group's services and that pursuant to the contract, the District owed Ambush Group $135,259.72. The services to which Ambush Group referred included an audit of AT & T bills to determine whether the District was being overcharged for equipment. On January 19 and 20, 1999, the CAB convened an evidentiary hearing to determine whether the scope of the contract permitted Ambush Group to audit equipment billings from AT & T and whether Ambush Group or the District initiated the AT & T refund.

At the hearing, Vernon Ambush, the president of Ambush Group, testified to the events giving rise to the equipment audit and the District's refusal to pay Ambush Group's last invoice. He stated that during the contract term, District personnel under William Bernhardt provided Ambush Group with telephone bills to review. Near the end of the contract term, the District provided Ambush Group with one or more invoices from AT & T, which contained billings related to telephone equipment. Ambush testified that he understood the work under the contract to be a line and circuit audit; however, he audited the equipment billings in the AT & T invoice because the RFP stated that the District also required "an audit to verify the accuracy of invoices." Ambush further testified that he told the District in a meeting on September 16, 1994, about the overbillings for unused AT & T equipment, and he reiterated the finding in a September 22, 1994 memorandum to the District. The memorandum lists several outstanding matters in an ultimately unsuccessful request for the District to extend the contract term. The memorandum only references AT & T by stating, "[Ambush

Group] has discovered a potentially large amount of over-billing with the AT & T accounts. We are in the process of verifying our findings." On September 26, 1994, Ambush Group sent a memorandum to AT & T, identifying the discrepancy. In letters of response, AT & T indicated that credit would be issued to the District.

The District presented contrary evidence seeking to show that an equipment audit was outside the scope of the contract. William Bernhardt, who served as the District's coordinator on the Ambush Group contract, testified that District personnel did not direct Ambush Group to audit the District's equipment billings and that he personally did not have the contracting authority to authorize such an audit. He further testified that prior to the end of the contract term, he did not have any indication that Ambush Group was conducting an equipment audit.

The District argued before the Board, as it does now on appeal, that significance should not be attached to the fact that it provided Ambush Group with the AT & T invoices because the face of the invoices did not reveal the billings were for equipment. Instead, the District argued that Ambush Group should have left the invoices alone once they realized by utilizing a manual of billing codes that the billings were for equipment.

In their presentations to the CAB, neither party relied on the provisions of the BAFO in their arguments about the contract's meaning.

**II.**

The CAB found that the equipment audit was within the scope of the contract and ordered the District to compensate Ambush Group in the amount of

tract was void and that no further payments would be made under the contract.

$135,259.72. The CAB found in relevant part: (1) the RFP "was an open-ended invitation [for offerors] to propose to discover other savings" besides the savings achieved from a line and circuit audit; (2) the audit work began at a meeting on January 11, 1994 "to discuss the future line and circuit audit," to which the District invited AT & T; (3) the District gave Ambush Group certain AT & T invoices to review; and (4) Ambush Group audited the invoices and reported overbilling to both the District and AT & T before the contract period expired. The CAB also found that AT & T did not provide dial tone service to the District, that "AT & T supplied equipment ... and possibly long distance service" to the District, but even if AT & T provided long distance service, such service was invoiced by Bell–Atlantic.

Despite the contract's integration clause, the CAB found that "the entire BAFO was an integral part of the contract negotiation" and therefore admissible to establish the contract's meaning. After determining that the entire BAFO should be considered, the CAB found that

> [b]y themselves, certain of the individual incorporated BAFO provisions may be unclear as to whether they include audit of AT & T equipment, as opposed to lines and circuits. Any ambiguity disappears, however, when read in the context of the entire BAFO. Ambush's introduction to the BAFO is replete with specific references to audit of AT & T equipment billings.... Since the incorporated sections and the introduction were included in a single BAFO document submitted by Ambush, the [CAB] must read terms used in the scope of work consistently with the same terms in the introduction. Read together with the introduction to the BAFO, we believe that the most reasonable interpretation of the scope of work incorporated from the BAFO into the executed con-

tract is that the references to gathering AT & T information and preparing a formal claim to AT & T must include AT & T equipment. This interpretation is confirmed by the final step in Phase III which requires Ambush "to calculate savings to be realized by the disconnection of identified unused lines and equipment."

The CAB did not explain its conclusion that certain of the incorporated BAFO provisions were "unclear." However, the CAB did explain that it found further support for its conclusion based on its findings that the District gave Ambush Group the AT & T invoices to review and that the District invited AT & T, among other service providers, to the January 1994 meeting to discuss the pending audit. Thus, the Board reasoned that where AT & T invoices only contained equipment billings, by giving such invoices to Ambush Group and by inviting AT & T to the initial meeting, the District demonstrated its intent for Ambush Group to audit the AT & T invoices, i.e., equipment billings.

### III.

■ "We review the CAB's factual findings deferentially." *Unfoldment, Inc. v. District of Columbia Contract Appeals Bd.*, 909 A.2d 204, 208 (D.C.2006) (quoting *Eagle Maint. Servs., Inc. v. District of Columbia Contract Appeals Bd.*, 893 A.2d 569, 576 (D.C.2006)). Such findings are final and conclusive unless a "decision is fraudulent, arbitrary, capricious, or so grossly erroneous as to necessarily imply bad faith, or if the decision is not supported by substantial evidence." D.C.Code § 2–309.07 (2001). Furthermore, we "accord great weight to the [CAB's] construction of a government contract, so long as that construction is not unreasonable." *Unfoldment, Inc., supra,*

909 A.2d at 208–09 (citing *Abadie v. District of Columbia Contract Appeals Bd.*, 843 A.2d 738, 741 (D.C.2004)). However, "[o]n legal questions, ... the [CAB's] ruling is neither final nor conclusive." *Id.* at 209 (citing *Abadie, supra*, 843 A.2d at 741) (other citation and internal quotation marks omitted).

▮▮▮▮▮ The proper interpretation of a contract, including whether a contract is ambiguous, is a legal question, which this court reviews *de novo. Id.; Belcon, Inc. v. District of Columbia Water & Sewer Auth.*, 826 A.2d 380, 384 (D.C.2003).

> [A] contract is ambiguous when, and only when, it is, or the provisions in controversy are, reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings, and it is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends....

*Burbridge v. Howard Univ.*, 305 A.2d 245, 247 (D.C.1973) (alteration in original) (quoting 17A C.J.S. *Contracts* § 294 at 34–35 (1963)). In determining whether a contract is ambiguous, we examine the document on its face, giving the language used its plain meaning. *Sacks v. Rothberg*, 569 A.2d 150, 154 (D.C.1990). This jurisdiction adheres to an "objective" law of contracts, meaning

> the written language embodying the terms of an agreement will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake.[3]

*DSP Venture Group, Inc. v. Allen*, 830 A.2d 850, 852 (D.C.2003) (alteration in original) (quoting *Geiger v. Crestar Bank*, 778 A.2d 1085, 1091 (D.C.2001)); *see also Minmar Builders, Inc. v. Beltway Excavators, Inc.*, 246 A.2d 784, 786 (D.C.1968) (holding that where a contract is integrated, "those who executed it will not be allowed to place their own interpretation on what it means or was intended to mean") (quoting *Slice v. Carozza Props.*, 215 Md. 357, 137 A.2d 687, 693 (1958)); *cf. Bolling Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 475 A.2d 382, 385 (D.C.1984) ("If the release is facially unambiguous, we must rely solely upon its language as providing the best objective manifestation of the parties' intent.").

▮▮▮▮▮ "If the court finds that the contract has more than one reasonable interpretation and therefore is ambiguous, then the court—after admitting probative extrinsic evidence—must determine what a reasonable person in the position of the parties would have thought the disputed language meant." *In re Bailey*, 883 A.2d 106, 118 (D.C.2005) (quoting *Capital City Mortgage Corp. v. Habana Vill. Art & Folklore, Inc.*, 747 A.2d 564, 567 (D.C. 2000)) (internal quotations omitted); *see also 1901 Wyoming Ave. Co-op. Ass'n v. Lee*, 345 A.2d 456, 461–62 (D.C.1975) ("Where the court is faced with an integrated agreement which contains ambiguous terms, the standard of interpretation is what a reasonable person in the position of the parties would have thought it meant.") (internal quotation omitted). "Extrinsic evidence may include the circumstances before and contemporaneous with the making of the contract, all usages—habitual and customary practices—which either party knows or has reason to know, the circumstances surrounding the transaction

---

**3.** In this case, there are no allegations of     fraud, duress or mutual mistake.

and the course of conduct of the parties under the contract." *In re Bailey, supra,* 883 A.2d at 118 (quoting *Capital City Mortgage Corp., supra,* 747 A.2d at 568 n. 2) (internal quotations omitted). A reasonable person is presumed to know "all the circumstances before and contemporaneous with the making of the integration" and is

> bound by all usages—habitual and customary practices—which either party knows or has reason to know. The standard is applied to the circumstances surrounding the transaction and to the course of conduct of the parties under the contract, both of which are properly considered when ambiguous terms are present.

*Lee, supra,* 345 A.2d at 461–62 (footnotes omitted).

## IV.

■■■ The parties disagree about whether ambiguity exists surrounding (1) a reference to "equipment" in an incorporated portion of the BAFO; (2) references to AT & T in the incorporated portions of the BAFO; and (3) the RFP, which includes some general language concerning invoices. We are mindful that a contract is not ambiguous "merely because the parties disagree over its meaning, and courts are enjoined not to create ambiguity where none exists." *Washington Properties, Inc. v. Chin, Inc.,* 760 A.2d 546, 548 (D.C.2000); *see also Bragdon v. Twenty–Five Twelve Assocs. Ltd. P'ship,* 856 A.2d 1165, 1170 (D.C.2004) ("A court ... will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity ....") (internal citations omitted).

■■■ As stated, *supra,* Phase III of the BAFO concludes by proposing that Ambush Group "[c]alculate the fiscal year ... savings projected from the disconnection of identified unused lines and *equipment.*" [4] [emphasis added.] At the outset, we note that Phase III is incorporated into the contract by Article I, the scope of work provision, which states that "[t]he Government requires that the Contractor identify all line and circuit billing errors, including, but not limited to, those described above, in accordance with the following" and then lists the incorporated BAFO phases, including Phase III. Therefore, the phrase "all line and circuit billing errors" in Article I is the overarching limitation on billing error activities.

Phase III does not deal with the auditing of billing errors; instead, it is a proposal to undertake a savings analysis—a projection of savings of unused lines through on-site visits. By contrast, Phases II and V expressly propose an audit of billing errors by proposing "a comparative analysis of the information disclosed from the records of ... vendors versus the actual count recorded during the on-site physical inventory" and "a formal audit report detailing the billing errors disclosed by the comparative analysis" to "[p]repare a formal claim for any refunds ...." and to "[s]ubmit the formal audit report claim(s) for refunds...." Therefore, to the extent Phase III mentions equipment, it is in the context of auditing unused lines and analyzing a projected savings, not in the context of auditing billing errors.

Likewise, the parties disagree about whether the scope of work provision is ambiguous based on the references to AT & T in the incorporated BAFO phases. The CAB found that while AT & T may

4. The fact that "equipment" is a term of art in this context does not create ambiguity where both parties agree that the term is used to describe hardware used to connect lines and circuits.

have supplied long distance service to the District, AT & T was primarily an equipment supplier. Therefore, the CAB found it reasonable to conclude that the contract's scope of work provision included an equipment audit. However, the references to AT & T are explained by the context in which they are used. First, the references are limited by the language in Article I, which, as stated, *supra*, sets out a scope of work pertaining only to line and circuit billing errors. Second, where the references to AT & T are followed by the words "and circuit vendors," the plain meaning conveyed is that AT & T is one of the District's circuit providers. Therefore, the references to AT & T are within the context of AT & T as a circuit vendor.

■ Finally, Ambush Group asserts that ambiguity exists because the scope of work provision incorporates the RFP, which states that "the government also requires an audit to verify the accuracy of invoices." In our view, the language of the document is unambiguous given the overarching subject line, the description of lines and circuits and the reiteration that the proposed work is a line and circuit audit. Although the RFP contains general language, i.e., the unmodified term "invoices," specific language in a contract is given greater weight than general language. *Washington Auto. Co. v. 1828 L Street Assocs.*, 906 A.2d 869, 880 (D.C. 2006) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 203(c) (1981)).

Here, the face of the integrated contract has an unambiguous meaning without resorting to other extrinsic evidence: the proposed work was a line and circuit audit, not an equipment audit. This meaning is underscored by the "order of precedence" provision in Article VIII, which states that "inconsistencies" be resolved by looking first to the contract document, then to the RFP and finally to the BAFO. The incor-

porated provisions are expressly limited by Article I of the contract document, which calls for Ambush Group to identify line and circuit billing errors. The CAB erred by relying on portions of the BAFO (particularly the introduction) that had not been incorporated into the contract.

The contract was unambiguous on its face. To hold otherwise would violate the teachings of *Bragdon v. Twenty–Five Twelve Assocs. Ltd. P'ship*, *supra*, which held that "[a] court . . . will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." 856 A.2d at 1170. That the parties disagree about the contract's meaning does not indicate otherwise. *Washington Props., Inc.*, *supra*, 760 A.2d at 548.

*Reversed.*