**In re Charles A. MAY; Edward A. Beck, III, Appellant,**

v.

**CONTINENTAL CASUALTY COMPANY (CNA Surety), Appellee.**

**No. 04–PR–1232.**

District of Columbia Court of Appeals.

Argued Nov. 8, 2005.

Decided Sept. 13, 2007.

Kenneth J. Loewinger, Washington, District of Columbia, for appellant.

James F. Bromley, Washington, District of Columbia, for appellee.

Before GLICKMAN, Associate Judge, and STEADMAN and SCHWELB, Senior Judges.*

GLICKMAN, Associate Judge:

This appeal requires us to construe the standard form of conservator's bond prescribed by the Register of Wills. The term of the bond is indefinite, as it continues in effect for the duration of the conservatorship, though the surety charges an annual premium. The issue is whether the surety's potential liability is limited to the penalty amount stated in the bond, regardless of the number of years the bond remains in force, or is cumulative for each year of coverage. We hold that the bond is not cumulative, and that the face amount of the bond establishes the surety's maximum liability.

## I.

On June 30, 1993, the Probate Division of Superior Court appointed Flora Snead to serve as guardian and conservator for her son, Charles A. May. The order of appointment required Ms. Snead to obtain from an approved surety a bond for the faithful discharge of her duties as conservator in the amount of $10,000. *See* D.C.Code § 21–2058 (2001); Super. Ct. Prob. R. 332. Ms. Snead acquired the necessary bond from appellee's predecessor in interest, Continental Insurance Company. Two years later, the estate of Mr. May under conservatorship was augmented with the proceeds from a settled

personal injury claim, and the court directed Ms. Snead to obtain an additional surety bond in the amount of $113,500. Continental Insurance Company also issued this second bond. Ms. Snead paid an annual premium for the two bonds of $554.

In 2001, the probate court removed Ms. Snead as conservator of May's estate because she had failed to file required annual accounts with the court. *See* D.C.Code § 21–2065(a) (2001); Super. Ct. Prob. R. 330. Appellant Edward A. Beck III was named successor conservator. A court-appointed special master eventually found that Ms. Snead had failed to account for $193,444.63 in annuity and Social Security income payments between October 1994 and August 2001. Based on the special master's report, the court in January 2004 entered judgment against both Ms. Snead[1] and appellee CNA Surety, "individually and severally," for $193,444.63, plus $5,686.69 in fees and costs.

CNA Surety tendered $123,500, the total face amount of the two conservator's bonds, in full satisfaction of its obligations, but Mr. Beck demanded that it pay the entire judgment. Mr. Beck asserted that the surety bonds were renewed each year with the payment of the annual premium, and that the full penalty amount of each bond therefore was available for each year the bond was in effect to cover Ms. Snead's defalcations in that year. (It appears that no losses in any single year exceeded the sum of the face amounts of the two bonds.) In other words, according to Mr. Beck, the surety's liability under each bond was cumulative from year to year while the bond was in force, exactly as if Ms. Snead had

---

* Judge Schwelb was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on June 24, 2006.

1. We are informed that Ms. Snead died sometime in 2001, not long after the court terminated her appointment as conservator.

purchased a separate bond covering each year of her tenure as conservator. Because the first bond was purchased in 1993 and the second bond was purchased in 1995, the surety's total potential liability through 2001 under Mr. Beck's interpretation was $761,000 ($10,000 per year for eight years plus $113,500 per year for six years)—well above the amount of the court's judgment.

CNA Surety disputed Mr. Beck's view of its obligations. It claimed that the two bonds were of continuous and indefinite duration, and that its exposure was not cumulative from year to year, but was capped at the face amounts of the bonds for the whole multi-year period. Having tendered the face amounts, CNA Surety petitioned the probate court to discharge it from its liability as surety. The court treated this petition as a motion for relief from judgment under Super. Ct. Civ. R. 60(b) (having found, *inter alia,* that CNA Surety had not had an opportunity to address the issue of the extent of its liability before the judgment was rendered). Over Mr. Beck's opposition, the court agreed with CNA Surety and granted the discharge petition. This appeal followed.

## II.

■ Is CNA Surety's liability limited to the maximum penalties stated on the face of the bonds purchased by Ms. Snead, or is the surety subject to liability (up to those maxima) for each year of coverage in which Ms. Snead misappropriated funds belonging to her ward's estate? In the shorthand terminology employed by the parties (and in a vast number of judicial decisions treating fidelity bonds of all kinds), the sole issue before us is whether the conservator's bonds were "continuous" or "cumulative." [2] The question of whether a fidelity bond is continuous or cumulative has arisen in many different contexts and has vexed many courts for a century. As might be expected, the decisions in this area are not uniform in their reasoning or their outcomes. *See generally* H.D. Warren, Annotation, *Extent of liability on fidelity bond renewed from year to year,* 7 A.L.R.2d 946 (1949).

■ It is generally said that "the liability of a surety cannot be extended beyond the terms of the surety contract." *In re Estate of Spinner,* 717 A.2d 362, 366 (D.C.1998). In this case, those terms are set forth in the conservator's bonds, which are a species of fidelity insurance.[3] The proper interpretation of the bonds, as of any contract, including whether they are ambiguous, "is a legal question, which this court reviews *de novo." Tillery v. District of Columbia Contract Appeals Bd.,* 912 A.2d 1169, 1176 (D.C.2006). In answering that question, we apply established rules of contract interpretation. *See generally id.* at 1176–77; *Cameron v. USAA Prop. & Cas. Ins. Co.,* 733 A.2d 965, 968 (D.C.1999) (contracts of insurance); *United States v.*

**2.** Appellant raises another issue in his reply brief, arguing that CNA Surety's discharge petition was untimely and did not satisfy the requirements for post-judgment relief under Super. Ct.Civ. R. 60(b). Because appellant did not present this contention (which the trial court rejected) in his initial brief, we decline to consider it. *See Stockard v. Moss,* 706 A.2d 561, 566 (D.C.1997).

**3.** "Bonds or contracts of insurance guaranteeing the fidelity of employees, fiduciaries, and so forth, ... constitute an important branch of insurance." 11 COUCH ON INSURANCE 3RD § 160:1, at page 160–7. Fidelity bonds on court-supervised fiduciaries and public officials are a distinct sub-category of this branch, among other reasons because the bonds typically are purchased by the person whose fidelity is ensured, and because the bonds generally are required by statutes that specify their essential terms. *Id.* at 160–9; *see also id.* at § 166:25, page 166–27.

*Ins. Co. of N. Am.,* 327 U.S.App. D.C. 383, 387–88, 131 F.3d 1037, 1041–42 (1997) (surety bonds). In brief: we adhere to an "objective" law of contracts, meaning that "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties regardless of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake." *Tillery, supra* (internal brackets, citations and footnote omitted). Thus, "[w]here insurance contract language is not ambiguous ... a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." *Cameron, supra* (internal quotation marks, brackets and citation omitted). "In determining whether a contract is ambiguous, we examine the document on its face, giving the language used its plain meaning," *Tillery, supra,* unless, in context, it is evident that the terms used have a technical or specialized meaning. A contract is not ambiguous merely because the parties disagree over its meaning. *See Cameron, supra.* Rather, a contract is ambiguous if, on its face, it has more than one reasonable interpretation. In that event, "the court—after admitting probative extrinsic evidence—must determine what a reasonable person in the position of the parties would have thought the disputed language meant." *Tillery, supra* (internal quotation marks and citations omitted). (Of course, if there remains a genuine dispute over the meaning of the facially ambiguous contract language after the

marshaling of extrinsic evidence, the issue will not be susceptible to resolution as a matter of law.) [4]

■ There is a pertinent caveat to the rule that a surety's liability is governed by the terms of the bond. Fidelity bonds mandated by statute (often referred to as "statutory bonds") must be interpreted "in harmony" with the statutory scheme. 11 COUCH ON INSURANCE 3D § 166:28, at 166–28 (footnote omitted). The terms of the law prescribing the bond "are to be read into the bond," and the bond "must be construed in light of the purpose of the statute." *Cooper v. The Hartford Fin. Serv's. Group, Inc.,* 2005 WL 1378907, at *1, No. 04–383, 2005 U.S. Dist. LEXIS 11434, at *6 (D.D.C. June 9, 2005) (citations omitted).

■ As the conservator of May's estate, Ms. Snead was a court-supervised fiduciary. The probate court directed her to furnish the bonds at issue in this case pursuant to a statute that provides as follows:

The court may require a conservator to furnish a bond conditioned upon faithful discharge of all duties of the trust according to law, with sureties as it shall specify. Unless otherwise directed, the bond must be in the amount of the aggregate capital value of the property of the estate in the conservator's control, plus 1 year's estimated income, and minus the value of securities deposited under arrangements requiring an order of the court for their removal and the value of any land that the fiduciary, by express limitation of power, lacks power to

---

4. "Since insurance contracts are written exclusively by insurers, courts generally interpret any ambiguous provisions in a manner consistent with the reasonable expectations of the purchaser of the policy." *Cameron, supra.* "But 'the canon of construction known as *contra proferentum*—that ambiguities in an

insurance contract should be construed against the insurer who drafted the contract— is traditionally used only in cases of doubt where other factors are not decisive.' " *Id.* (quoting *United States v. Ins. Co. of N. Am.,* 327 U.S.App.D.C. at 389 n. 11, 131 F.3d at 1043 n. 11.).

sell or convey without court authorization.

D.C.Code § 21–2058. Although the statute affords the court a measure of discretion, conservators routinely are required to obtain fidelity bonds unless they come within an applicable exemption [5] or special circumstances exist that render bonding unnecessary. Another statute, applicable to conservator's bonds and fiduciary bonds in general, states in pertinent part that "the bond shall continue in force as against both the principal and sureties until the funds or estate are fully accounted for and paid over or delivered to the parties interested therein...." D.C.Code § 28–2504 (2001); see In re Estate of Green, 816 A.2d 14, 19 (D.C.2003) (characterizing the quoted statutory language as "compelling and clear").

In accordance with Super. Ct. Prob. R. 332(a), which implements the statutory requirements, the conservator's bonds obtained by Ms. Snead from Continental Insurance Company were filed on a standard form prescribed by the Register of Wills.

As the form provides, the term of each bond is indefinite; each bond is conditioned on Ms. Snead's faithful discharge of "all" her duties; each bond specifies a "maximum" penalty amount; and each bond provides that upon default by the principal (Ms. Snead), "the damages, not exceeding the sum aforesaid," may be ascertained, and the court may give judgment against the parties. The second bond states that it is "additional," which we understand to mean that it supplemented rather than superseded the first bond. Otherwise, the wording of the two bonds is virtually identical, except for the penalty amounts ($10,000 and $113,500).[6]

There is no support to be found in the language of the bonds themselves for the claim that they are cumulative from year to year. The terms of the bonds are not limited to a particular year or any other definite period of time; rather the terms are indefinite, as the bonds cover the entire period of Ms. Snead's conservatorship. Nor are the terms linked to the payment of an annual premium.[7] Similarly, the

---

5. Super. Ct. Prob. R. 332(b) provides that no bond shall be required of a bank or trust company authorized by law to act as a conservator.

6. The first bond reads in pertinent part as follows:

Know all persons by these presents, that whereas the undersigned Flora Snead [address omitted] has been appointed Permanent conservator of Charles A. May by order of the Court, dated June 30, 1993 and is required to give a bond, under seal, in the maximum amount of Ten Thousand & no/100 dollars, fixed by the Court, conditioned as by law and said order required: And whereas the condition of this undertaking is that the said Flora Snead shall faithfully discharge all duties of the trust according to law as such conservator and in all things obey such order as the Court shall make in the premises:

We, therefore, the undersigned, Flora Snead, as principal and Continental Insur-

ance Co. of Keene, N.H. as surety appearing and submitting to the jurisdiction of the Court, hereby undertake for ourselves and each of us, our and each of our heirs, personal representatives, successors, and assigns to abide by and perform the order of the Court in the premises, and do further agree that upon default by the said principal in any of the conditions hereof, the damages, not exceeding the sum aforesaid, may be ascertained in such manner as the Court shall direct; that the Court may give judgment hereon in favor of any person thereby aggrieved against us for damages suffered or sustained by such aggrieved party and that such judgment may be rendered in said cause against all or any of us whose names are hereto signed: [signatures of Flora Snead and Attorney in fact for Continental Insurance Company].

7. In fact, the bonds themselves say nothing about the annual premiums. Furthermore, appellant points us to no ancillary agreement

bonds do not purport to impose a cumulative penalty on an annual (or other) basis; rather, they state that damages upon default may not exceed the maximum amount specified. The indefinite terms and the explicit limitations on damages support the argument that the bonds are continuous, not cumulative, and that the surety's liability is capped for the entire period of coverage at the stated limit. In so reading the bonds, we are guided by longstanding precedent in this jurisdiction.

In *Columbia Hospital for Women & Lying-In Asylum v. United States Fidelity & Guaranty Co.*, 88 U.S.App.D.C. 251, 188 F.2d 654 (1951), the surety had issued a $5,000 fidelity bond on a bookkeeper who subsequently embezzled $18,975 over four years before being discovered. In holding that the bond was continuous, not cumulative, the United States Court of Appeals the District of Columbia Circuit stated:

> It has generally been held that "where the bond is for an indefinite term, the date it begins to run being the only date given, the fact that the premiums were paid annually does not make the relation a series of separate yearly contracts." ... Accordingly, even in the absence of a specific provision against cumulative liability, it has been held that the continuous term of the bond impliedly excluded liability in excess of the amount stat-

ed in the bond, in spite of the extent of actual losses over the years.... Where, as here, in addition to the continuous term of the bond, there was language in the bond ... which militated against a finding of cumulative liability, the courts have consistently held liability to be limited, in the aggregate, to the amount stated in the bond (i.e., non-cumulative).

*Id.*, 88 U.S.App.D.C. at 254, 188 F.2d at 657 (citations omitted). As stated in a leading treatise:

> A fidelity policy may be so worded that it has a commencement date, but no definite end date, stating instead various conditions which will cause its termination. This may be interpreted to mean that only one continuous bond existed or was ever contemplated, with subsequent premiums merely extending the coverage period but not creating any new contracts.

11 Couch on Insurance 3d § 160:79, at 160–72 (footnote omitted).[8]

The employee bond in *Columbia Hospital* stated explicitly that the payment of annual premiums "shall not render the amount of this bond cumulative from year to year." 88 U.S.App.D.C. at 252, 188 F.2d at 655. The conservator's bonds in the case at bar do not address the subject of cumulation specifically. However, the

---

setting forth the terms and conditions under which the premiums were paid or tying bond coverage to the premiums.

**8.** *Columbia Hospital's* guidance is consistent, also, with case law in Maryland, *see Commissioners of Leonardtown v. Fidelity & Casualty Co.*, 259 Md. 532, 270 A.2d 788, 790 (1970) ("Had the bond been written for an indefinite term and renewal premiums been paid each year, the bond would be regarded as a continuing one, unless it was clearly otherwise provided."), and the decisions of numerous other courts. *See, e.g., Montgomery Ward & Co. v. Fidelity & Deposit Co. of Md.*, 162 F.2d 264, 266–67 (7th Cir.1947); *Aetna Cas. &*

*Surety Co. v. First Nat. Bank of Weatherly, Pa.*, 103 F.2d 977, 978–79 (3d Cir.1939); *Leonard v. Aetna Cas. & Surety Co.*, 80 F.2d 205, 206–07 (4th Cir.1935). *See also A.B.S. Clothing Collection, Inc. v. Home Insurance Co.*, 34 Cal.App.4th 1470, 41 Cal.Rptr.2d 166, 169 (1995) (stating, after surveying cases from many jurisdictions, that "where the terms of the contract, taken as a whole, establish an intention the policy be continued indefinitely, subject to the payment of an annual premium, the contract is a continuous one and the insurer's limit of liability is the amount stated in the contract regardless of the number of years involved or number of premiums paid").

bonds state a "maximum" penalty, and further state that upon the conservator's default during the entire period of coverage, "the damages, *not exceeding the sum aforesaid,* may be ascertained in such manner as the Court shall direct." (Emphasis supplied.) The import of this language seems to us to be clear enough: the surety's liability exposure shall not exceed the penalty amounts of the bonds, regardless of how the damages are determined. While appellant urges that ambiguity in the bonds should be construed against the surety—a debatable proposition here, where the language in question is that of the Register of Wills and not the insurer— we do not find the bonds ambiguous on the point in issue. The language points in only one direction. *Contra proferentum,* see note 4, *supra,* is not a warrant for courts to "indulge in forced constructions to create an obligation against the insurer." *Cameron,* 733 A.2d at 968 (internal quotation marks and citation omitted).

The statutory scheme in which conservator's bonds fit also appears to envision that such bonds in particular will be continuous rather than cumulative. As previously noted, D.C.Code § 28–2504 required that the bonds continue in force for the entire period of the conservatorship through the final accounting, rather than for specified annual (or other) terms. It is telling, moreover, that D.C.Code § 21–2058, quoted above, provides that the penalty amount of a conservator's bond normally must equal the aggregate value of all the property of the estate in the conservator's control plus a year's estimated income. Pre-

sumably the statute requires that only one year's estimated income be considered in gauging the amount at risk because the conservator must provide an annual accounting, which is to be audited by the Register of Wills. *See* D.C.Code § 21–2065(a); Super. Ct. Prob. R. 330, 331. The annual accounting and audit process, when followed, is designed to detect malfeasance on the part of the conservator, including misappropriation of the income of the estate; thus, only a single year's income should be at risk at any one time. Evidently, therefore, the penalty amount of the bond is intended to cover the entire foreseeable loss that might occur as a result of the conservator's misconduct, assuming compliance with the statute's annual accounting and audit requirements, whether such a total loss is suffered in a single year or over a multi-year span.[9] A continuous bond in the proper amount provides the contemplated coverage. A cumulative bond exposing the surety to theoretical liability for several times the total possible loss would be excessive.[10] *Accord United States Fidelity & Guaranty Co. v. Christoffel,* 115 Ariz. 507, 566 P.2d 308, 312 (Ct.App.1977) ("[A]dherence to the statutory requirements . . . obviat[es] any need to interpret the bond as being cumulative."); *In re Rising,* 201 Misc. 869, 112 N.Y.S.2d 349, 353 (N.Y.Sur.Ct.1952) (holding that guardian's bond is continuous where, under applicable statute, the penalty amount is set by reference to "the aggregate" of the wards's assets and income under the guardian's control, and the surety's liability continues indefinitely until the principal

---

9. When the annual accounting and audit are neglected for a period of several years, as they were in this case, more than a single year's income may be at risk, and the amount of the bond may prove inadequate. However, we see no grounds for holding the surety responsible for such neglect, either in this case or as a general matter.

10. This is not to say that the amount of a conservator's bond should not be reviewed periodically, in conjunction with the annual audit requirement or in response to significant developments such as the personal injury claim settlement in this case, and adjusted to keep pace with any growth in the value of the estate's assets.

and the surety are discharged; "[s]uch liability is irreconcilable with the contention of petitioner that it was the intention of the parties that the liability of the respondent surety be predicated upon an annual basis"); *North Carolina ex rel. Duckett v. Pettee*, 50 N.C.App. 119, 273 S.E.2d 317, 320 (1980) (holding guardianship bond continuous, not cumulative). Significantly, we are aware of no cases holding a conservator's or guardian's bond to be cumulative.

Notwithstanding the foregoing considerations and authorities, appellant argues that the bonds should be deemed cumulative because Continental Insurance Company collected annual premiums from Ms. Snead. This argument is not based on any contractual provision respecting the premiums. Rather, appellant reasons, D.C.Code § 28–2504 mandated that the bonds would remain in force for the duration of the conservatorship, so Ms. Snead did not have to pay the annual premiums in order merely to continue the bonds; instead, she must have made the payments to obtain new bonds—or, more precisely, new, cumulative bond coverage [11]—each year. Otherwise, appellant argues, Ms. Snead obtained nothing in return for making premium payments after the first year. Even setting aside the statutory continuation requirement, appellant argues that unless the bonds were cumulative, the annual premiums that Ms. Snead paid after her defalcations exceeded $123,500 bought no coverage at all. Since it makes no sense to pay premiums for nothing, appellant concludes that the only reasonable interpretation of the bonds is that they are cumulative. *See Columbia Hospital*, 88 U.S.App. D.C. at 257, 188 F.2d at 660 (Clark, J., dissenting) (suggesting that no reasonable person would "go on paying premiums on an extinct bond from which there was no possibility of protection in the future").[12]

The *Columbia Hospital* majority was not persuaded by appellant's arguments, and we think that appellant's logic is flawed. It is easy to say in hindsight, after it is belatedly discovered that a fiduciary's defalcations exhausted coverage, that annual premiums for a continuous bond following the exhaustion of coverage purchased no additional coverage. But when the premiums were paid, it was not yet known that coverage had been exhausted. The exhaustion of coverage only came to light afterward. In the uncertain meantime, the surety accepted the premiums as compensation for its commitment to accept the on-going risk of keeping the coverage in force up to the specified level. The premiums were simply installment payments, reflecting the fact that the longer

---

11. No new bonds or riders were issued in exchange for the annual premiums.

12. The basic argument propounded by appellant (and articulated in Judge Clark's dissent in *Columbia Hospital*) has persuaded some courts to hold fidelity bonds not involving conservators or guardians to be cumulative rather than continuous. *See, e.g., In re Endeco, Inc.*, 718 F.2d 879, 882 (8th Cir.1983) ("If liability on the bond were not considered cumulative, there may well have been no reason for additional premium payments in successive years. For if it is determined ... that Herzog's defalcations in the first year equalled or exceeded the amounts of the bonds, the additional premiums would have been paid for nothing."); *United States v. American Surety Co. of New York*, 172 F.2d 135, 139 (2d Cir.1949) ("The substantial and controlling point is that an annual premium was required and paid in the expectation of the obvious protection which that should afford."). *But see id.*, 172 F.2d at 139–140 (Swan, J., dissenting); *Brulatour v. Aetna Cas. & Surety Co.*, 80 F.2d 834, 836 (2d Cir.1936) (following "the rule that, where the bond is for an indefinite term, the date it begins to run being the only date given, the fact that the premiums were paid annually does not make the relation a series of separate yearly contracts.").

the bond remained in effect, the greater the risk assumed by the surety, and the more the bond therefore should cost. Where the term of a bond is indefinite, "there is no practical way to calculate the premiums except on an annual basis." *Christoffel,* 566 P.2d at 311. ("Therefore," the court added, "the fact that the premiums are charged annually does not show the bond is cumulative in nature." *Id.*) The surety's promise to be liable for losses due to the fiduciary's misconduct for the entire duration of the bond, up to a specified amount, regardless of when those losses might occur, is consideration for the entire stream of premium payments even if it later turns out that such losses exhausted the coverage before some later installments became due. If that happened, it may mean that the level of coverage was inadequate to the needs of the situation, and that a higher level of coverage should have been purchased, but it does not mean that the later premiums were for nought. It makes as much sense to say that the later premiums were a waste of money as it would to say that premiums paid before coverage was exhausted for years in which there were no defalcations at all were a waste of money.

Furthermore, it is not irrational to buy a certain (hopefully adequate) dollar amount of coverage for an indefinite period of time (the life of the conservatorship, in this case) instead of buying annual, cumulative coverage. For one thing, there is the matter of cost. An insured is not necessarily better off paying for a cumulative bond (or a series of cumulating annual bonds) than a continuous bond. The record does not disclose how Continental Insurance Company priced the bonds it sold to Ms. Snead, but presumably it would charge more for $761,000 than for $123,500 in coverage (even taking the different terms into account). Cumulative bond coverage at a given annual dollar limit presumably should be more expensive than a single continuous bond at that limit, since the former exposes the surety to substantially greater total risk. *Cf. A.B.S. Clothing Collection,* 41 Cal.Rptr.2d at 169 (noting the connection between "a lower limit of liability" under a continuous bond and "a lower premium"). As explained above, the rationality of continuous coverage is particularly strong in the case of a conservator's bond, where the presumably more expensive cumulative coverage would be redundant so long as there is compliance with supervisory requirements.

In addition to the price differential, it has been recognized that a continuous bond may have other advantages. Notably, "if the insured took out a new bond each year instead of renewing the old bond, the insured would have to prove the exact time when a particular loss occurred so as to place it under the coverage of a bond issued for a specified year." *Columbia Hospital,* 88 U.S.App.D.C. at 254, 188 F.2d at 657. Depending on policy requirements, the insured "might fail to recover altogether if it did not discover and report the loss under a particular bond" within a short reporting period immediately following the loss. *Id.* "In contrast, under [a continuing] bond, as renewed from year to year, the requirement of discovering and reporting losses is extended when the bond is renewed, and the ... period for the discovery and reporting of losses follows the total period ... during which the bond has been in effect." *Id.; accord Leonard,* 80 F.2d at 207 (noting that a continuous bond eliminates "the difficulty experienced by the obligee in many cases of proving when a defalcation occurred and against what period of contract it should be charged"); *A.B.S. Clothing Collection, supra.*

The gist of appellant's arguments is that the existence of an annual premium ar-

rangement means either (1) that the only reasonable construction that can be given the bonds—contrary to their apparent meaning-is that they were cumulative, or, (2) that at the very least, the bonds are ambiguous (with ambiguity favoring the insured). We conclude, however, that annual premiums are not inconsistent with a continuous bond, and that the bonds in this case are unambiguously continuous. In the absence of ambiguity (or misrepresentation, which has not been alleged), "[w]e cannot give the [May estate] a new bond, different from the one [the conservator] paid for, and carrying greatly extended coverage." *Columbia Hospital,* 88 U.S.App.D.C. at 256, 188 F.2d at 659. Accordingly, we affirm the trial court and hold that the liability of CNA Surety on its two conservator's bonds is capped at their total face amount of $123,500. The surety owes no more than it tendered.